185 Cal.App.4th 309 (2010)
110 Cal.Rptr.3d 282
THE PEOPLE, Plaintiff and Respondent,
v.
XUE VANG et al., Defendants and Appellants.
THE PEOPLE, Plaintiff and Respondent,
v.
DANNY LÊ, Defendant and Appellant.
Nos. D054343, D054636.
Court of Appeals of California, Fourth District, Division One.
June 7, 2010.
As modified June 25, 2010.
*314 John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant Xue Vang.
Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant Dang Ha.
Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant Sunny Sitthideth.
Sachi Wilson, under appointment by the Court of Appeal, for Defendant and Appellant Danny Lê.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steve Oetting and Eric Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
McINTYRE, J.
The principal issue in this appeal is whether the court erred in admitting the gang expert's opinion regarding defendants' knowledge and *315 intent in committing the underlying assault over defense objections that the testimony exceeded the limits set forth in People v. Killebrew (2002) 103 Cal.App.4th 644 [126 Cal.Rptr.2d 876] (Killebrew). One or more defendants also raise evidentiary issues, dispute the sufficiency of the evidence to support the verdicts, ask that we review the police officer personnel records viewed in camera by the trial court pursuant to Pitchess v. Superior Court (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (Pitchess), challenge a probation condition, and assert that any failure to make timely and specific objections or motions should be deemed ineffective assistance of counsel. We conclude that the court erred in admitting expert opinion on defendants' knowledge and intent in response to two hypothetical questions, but the error was harmless. We modify item 12G of the probation order for one defendant as agreed by the parties, and affirm the judgment as modified.

PROCEDURAL BACKGROUND
Police arrested Xue Vang, Sunny Sitthideth, Dang Ha and Danny Lê after breaking up a street fight in which William Phanakhon was knocked out, but not seriously injured. The jury convicted the four defendants of assault by means of force likely to cause great bodily injury, and found true the gang enhancement allegation. The jury found not true the special allegations that defendants personally inflicted great bodily injury and used a deadly weapon in the commission of the assault.
Vang, Sitthideth and Ha received prison sentences which included two or three years for the gang enhancement imposed under the California Street Terrorism Enforcement and Prevention Act (STEP Act). (Pen. Code, § 186.20 et seq.; undesignated statutory references are to the Penal Code.) The court sentenced Vang to a total of six years, Sitthideth to four years, and Lê to 12 years based on his admission that he had one prior strike. It suspended execution of Ha's sentence and placed him on probation with various conditions, including one year of jail custody. All four defendants appeal. Sitthideth and Lê expressly join in relevant arguments presented by their codefendants.

FACTUAL BACKGROUND
The victim, 20-year-old William Phanakhon, lived with his family in Mira Mesa. After graduating from high school, Phanakhon began hanging out with members of the Tiny Oriental Crips or "TOC" criminal street gang. At trial, Sitthideth, Ha and Lê stipulated to being members of TOC. However, Vang denied any gang connections. Phanakhon also denied gang membership. He stated he committed no crimes, and simply went out to eat, drink or hang around with people who were TOC members. Phanakhon met the four *316 defendants in the fall and winter of 2007. Sitthideth, Ha and Vang were often present when Phanakhon was with members of TOC. However, Phanakhon recalled meeting Lê on just one occasion. Eventually, Phanakhon began declining invitations to go out with gang members because "[t]his is not where [he] wanted [his] life to go."
Phanakhon was at home watching television between 10:00 and 11:00 on the night of April 28, 2008, when he received a phone call. The caller, whose voice sounded familiar, asked to come over. Phanakhon thought it was a neighbor and agreed. He went to his garage and Vang arrived a short time later. Phanakhon also saw Lê peek inside the garage. About five minutes later, Vang asked Phanakhon if he wanted to go hang out. Phanakhon followed Vang down the street. He also saw Ha and Sitthideth walking towards the corner. When Phanakhon rounded the corner, someone struck him in the back of the head from behind. He fell down and tried to protect his head from continued punches. Phanakhon was unable to describe anything about the assault because he lost consciousness until assisted by police and paramedics.
By coincidence, members of the San Diego Police Department gang unit were conducting surveillance near the scene of the assault. Detective Dave Collins was seated in an unmarked car watching the intersection through his side view mirror. Detective Collins was the only officer with a clear view of the incident, being situated approximately 110 feet away from the corner, which was illuminated by a street light. There was a second street light approximately 10 to 20 feet away from Detective Collins.
Detective Collins watched as four males approached the corner. Suddenly, three of the men began beating the fourth, but the victim did not fight back. At one point, the victim fell to the ground, but two of the assailants pulled him up and hit him again. Detective Collins observed two of the men back up while the third pulled out a stick or pipe and used it to strike the victim on the head. The victim fell to the ground a second time. Detective Collins broadcast that he was witnessing a "beat down." Officer Michael Dewitt, also part of the surveillance team, responded and was the first to arrive on the scene. He saw four men beating the victim.
As additional members of the surveillance team moved in, the assailants fled. Detective Collins arrested Vang after a short chase. Ha, Sitthideth and Lê were arrested nearby. However, a search of the scene failed to locate anything resembling the stick or pipe that Detective Collins described.
When Officer Jacob Resch arrived, he saw Phanakhon sitting upright on the curb. Detective Collins, who arrived after Officer Resch, observed that Phanakhon was nonresponsive to questioning even after Detective Collins *317 worked to revive him. Detective Collins also observed that the left side of Phanakhon's face had begun to swell. Paramedics transported Phanakhon to the hospital where he was examined for head injuries, then released.
Phanakhon offered at least two "guesses" for why he was assaulted by defendants. First, he believed he was attacked for "disassociating" himself from TOC, even though he testified that he had never been a member of the gang. Second, Phanakhon suggested that he got "checked" because he heard something he was not supposed to hear. Phanakhon stated that he was not afraid of defendants. He was, however, afraid of TOC and what might happen to him or his family if he testified at trial.
The prosecution called Detective Daniel Hatfield as its expert witness on criminal street gangs. Detective Hatfield testified about the culture and habits of gangs, including member-on-member discipline for no longer hanging out with the gang or not "putting in work." Turning to TOC, he described it as a predominantly Laotian group that split off from a larger gang set in the early 1990's and claimed Linda Vista as its territory. Detective Hatfield identified three separate predicate offenses committed by its members and opined that TOC was a criminal street gang. Given the stipulation, there was no dispute that Ha, Sitthideth and Lê were members of TOC. Detective Hatfield believed that Vang and the victim Phanakhon were also gang members. He described the Department of Justice guidelines and San Diego Police Department guidelines for documenting "contacts" with suspected gang members. He testified that although Vang had not identified himself as a gang member, he met all the Department of Justice guidelines. As to Phanakhon, Detective Hatfield stated that he met the San Diego Police Department guidelines based on his association with TOC. On cross-examination, Detective Hatfield testified that the three "contacts" with Phanakhon included (1) the April 28, 2008 incident at issue here; (2) a traffic stop in March 2008 in which San Diego police officers found a picture of a gang member in his passenger's purse, but no one in the car was identified as a gang member; and (3) the discovery in October 2007 of Phanakhon's number along with at least 50 others on Ha's cell phone. Detective Hatfield acknowledged that the San Diego Police Department guidelines for documenting gang members might differ from those the gang used to define its membership.
Over defense objection, Detective Hatfield responded to two hypothetical questions from the prosecution that tracked the facts of the case. Detective Hatfield opined that if a "young baby gangster" in TOC was not putting in work or hanging out with TOC members, a physical assault on that "young baby gangster" was designed to put the person "in check" and bring him back in line with the gang's expectations. He stated that the assault would benefit TOC and was committed in association with TOC and at the direction of *318 TOC members. Detective Hatfield also opined that, based on a second hypothetical that included Detective Hatfield's opinions as to the hypothetical parties' gang membership, the attack on the "young baby gangster" was gang motivated. When questioned further by the prosecution, Detective Hatfield responded that the hypothetical facts told him that "this is a gang-motivated incident. It wasn't about friends fighting among one another."
Vang testified at trial against the advice of his attorney. The court warned Vang that in addition to allowing impeachment with prior felony convictions, his testimony might open the door to questioning that could cause unnecessary damage to his own defense and that of the other defendants. Thereafter, Vang briefly testified that he was not a member of TOC, had no tattoos, and was not in any of the gang photos introduced at trial. On cross-examination, Vang acknowledged his priors. He also acknowledged that he hung out with members of TOC. Over defense objection that the question exceeded the scope of direct, Vang testified that he was hanging out with members of TOC on April 28, 2008. The court cautioned the prosecutor about the scope of direct examination and there were no further questions about the events of that date.
However, Sitthideth did testify about events that occurred in Phanakhon's garage before the fight on the street. Contrary to Phanakhon's testimony, Sitthideth stated that he, Vang, Ha and Lê went to Phanakhon's house around 9:00 p.m., where they all ate pizza in the garage. When Phanakhon brought "something" out of his pocket, he and Vang started calling each other names. Phanakhon challenged Vang to a fight, and the group went outside to watch the one-on-one fight between Phanakhon and Vang at the corner.

DISCUSSION

I. The Gang Enhancement

A. Admission of the Gang Expert's Opinion on Defendants' Knowledge and Intent

As we explained, the information included the special allegation that defendants committed the assault "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist criminal conduct by gang members within the meaning of" section 186.22, subdivision (b)(1). Defendants argue that the trial court abused its discretion when it allowed Detective Hatfield to testify in response to a hypothetical question that the assault on Phanakhon, thinly disguised in the hypothetical as "young baby gangster," was for the benefit of TOC and *319 was gang motivated. Defendants contend Detective Hatfield's testimony was mere speculation and the ultimate issues of knowledge and intent were for the jury to decide.
(1) Resolution of the question requires us to consider the gang testimony in light of rules that usually permit experts to testify on ultimate issues through hypothetical questions (Evid. Code, § 801; People v. Gardeley (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713] (Gardeley)), but disallow expert testimony on a specific defendant's knowledge and intent that "`"amounts to no more than an expression of his general belief as to how the case should be decided."'" (Killebrew, supra, 103 Cal.App.4th at pp. 647, 651.) We are also mindful of the common use of a fiction, which Ha's defense counsel aptly described when objecting to Detective Hatfield's testimony: "[W]hen a hypothetical is crafted so carefully that it is transparent to everybody in the courtroom, including the jury, that we are talking about the facts of this very case, I think that crosses the line and it becomes [Killebrew error] rather than an expert witness answering the general hypothetical... . And I think that what that does is pay lip service to the rule that you can offer a hypothetical, while in reality, as is perfectly apparent to every juror what you are really doing is asking the witness to opine on his [subjective] thoughts and ideas of the defendants . . . ." (2) Although a bright line between gang expert testimony which is or is not admissible to show knowledge and intent may be elusive, we conclude that Detective Hatfield's testimony crossed it. We agree with the rule of Killebrew that an expert witness may not offer an opinion on what a particular defendant is thinking. (Killebrew, supra, 103 Cal.App.4th at p. 647.) And more importantly here, the prosecutor may not circumvent that rule by asking the expert a hypothetical question that thinly disguises the defendant's identity. We also conclude that the error in admitting Detective Hatfield's responses to the hypothetical questions was harmless in the circumstances of this case.
(3) Under California law, a person with "special knowledge, skill, experience, training, or education" in a particular field may qualify as an expert witness and give testimony in the form of an opinion. (Evid. Code, § 720; see id., § 801, subd. (b).) However, expert testimony is admissible only if it relates to a subject "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) The culture and habits of criminal street gangs are appropriate subjects for expert testimony and therefore admissible. (Gardeley, supra, 14 Cal.4th at p. 617.) Expert opinion on a specific defendant's subjective knowledge and intent is not. (Killebrew, supra, 103 Cal.App.4th at pp. 647, 651.)
The trial court has "`considerable discretion'" to control how the expert is questioned "`to prevent the jury from learning of incompetent hearsay.'" and *320 "`to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.]" (Gardeley, supra, 14 Cal.4th at p. 619.) We review the trial court's rulings on the admissibility of expert testimony for abuse of discretion. (People v. Lindberg (2008) 45 Cal.4th 1, 45 [82 Cal.Rptr.3d 323, 190 P.3d 664].) Here, the trial court abused its discretion by admitting Detective Hatfield's testimony regarding defendants' knowledge and intent based on its apparent belief that such testimony was admissible so long as it was presented in the form of a hypothetical. As we explain, the prosecution may not use a hypothetical question to conceal an expert's improper testimony on the real defendants' subjective knowledge and intent.
(4) The prosecution typically offers expert testimony on criminal street gangs in two forms: (1) the expert's description of a particular gang's colors, territory, typical crimes, and other matters relating to gang culture or psychology based on "material not admitted into evidence" as long as it is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates" (Evid. Code, § 801; see, e.g., People v. Gonzalez (2005) 126 Cal.App.4th 1539, 1545 [25 Cal.Rptr.3d 124] [prison activities of the "Mexican Mafia"]) and (2) the expert's opinion in response to a hypothetical question based on facts shown by the evidence which asks the expert to assume their truth (Gardeley, supra, 14 Cal.4th at p. 618). On direct examination, the expert may describe the reasons for his or her opinion and the matter on which the opinion is based. (Evid. Code, § 802.) As long as that material meets a threshold requirement of reliability, "matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony." (Gardeley, supra, 14 Cal.4th at p. 618, original italics.)
(5) "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) However, courts cannot allow experts to express any opinion they may have about gangs and gang activities. (Killebrew, supra, 103 Cal.App.4th at pp. 651, 654.) The defendant in Killebrew was one of several men arrested in connection with a driveby shooting. He was not inside any of the three cars police suspected were involved, but was standing on a nearby corner when police stopped one of the cars. The discovery of a handgun at a nearby taco stand and in at least one of the cars formed the basis for Killebrew's prosecution for conspiring to possess a handgun. (Id. at pp. 647-649.) The court reversed his conviction on appeal. (Id. at p. 647.) The error identified in Killebrew was that "in response to hypothetical questions, the People's gang expert exceeded the permissible scope of expert testimony by opining on `the subjective knowledge and intent of each' of the gang members involved in the crime. [Citation.]" (People v. *321 Gonzalez, supra, 126 Cal.App.4th at pp. 1550-1551, original italics.) Specifically, the expert testified that each of the individuals in a caravan of three cars knew there were guns in two of the cars and jointly possessed the guns with everyone else in the three cars for mutual protection. (Id. at p. 1551.) (6) However, "Killebrew does not preclude the prosecution from eliciting expert testimony to provide the jury with information from which the jury may infer the motive for a crime or the perpetrator's intent; Killebrew prohibits an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial. [Citation.]" (Ibid.)
With two exceptions, post-Killebrew jurisprudence has been left entirely in the hands of the intermediate appellate courts. The Supreme Court distinguished Killebrew in People v. Ward (2005) 36 Cal.4th 186, 210 [30 Cal.Rptr.3d 464, 114 P.3d 717], noting that the expert opinions at issue fell within the gang culture and habit evidence approved in Gardeley. Killebrew received slightly more than a passing reference in People v. Gonzalez (2006) 38 Cal.4th 932 [44 Cal.Rptr.3d 237, 135 P.3d 649], where the Supreme Court again distinguished the circumstances of the case. In rejecting the defendant's claim of Killebrew error in the guilt phase, the Supreme Court noted that the challenged testimony was "quite typical of the kind of expert testimony regarding gang culture and psychology that a court has discretion to admit." (People v. Gonzalez, supra, 38 Cal.4th at p. 945.) "[W]ithout deciding" whether Killebrew was correct "in this respect," the Gonzalez court read the case as "merely `prohibit[ing] an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial.'" (People v. Gonzalez, supra, 38 Cal.4th at p. 946.) The Supreme Court attempted to clarify its comments in dicta included in a footnote: "Obviously, there is a difference between testifying about specific persons and about hypothetical persons. It would be incorrect to read Killebrew as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons." (Id. at p. 946, fn. 3.) Neither Ward nor Gonzalez addressed the issue presented herewhether an expert witness can offer an opinion in response to a hypothetical question as to a defendant's mental state where he cannot testify directly regarding a specifically named defendant's mental state.
(7) Reversal was required in Killebrew because the gang expert's testimony was the only evidence offered by the prosecution to establish the elements of the crime and there was no other evidence from which a reasonable jury could infer intent. (Killebrew, supra, 103 Cal.App.4th at p. 658; see also People v. Ochoa (2009) 179 Cal.App.4th 650, 661-662 [102 Cal.Rptr.3d 108] (Ochoa) [nothing in the circumstances of the carjacking sustained the expert witness's inference that it was gang related]; People v. Ramon (2009) 175 Cal.App.4th 843, 850-851 [96 Cal.Rptr.3d 459] [no facts from which the expert could discern whether the defendants were acting on their own behalf or on behalf of the gang]; In re Frank S. (2006) 141 *322 Cal.App.4th 1192, 1199 [46 Cal.Rptr.3d 839] (Frank S.) [no evidence apart from expert testimony to establish that the minor possessed a knife for the benefit of the gang].) "`[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]" (Ochoa, supra, 179 Cal.App.4th at p. 657, italics omitted.) "To allow the expert to state the minor's specific intent . . . without any other substantial evidence opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (Frank S., supra, 141 Cal.App.4th at p. 1199.) However, prejudicial error does not result in every case in which a gang expert offers testimony on an ultimate issue such as knowledge or intentat least not in cases where there is other evidence to support an inference that the alleged crime was committed for the benefit of the gang. (See, e.g., People v. Ferraez (2003) 112 Cal.App.4th 925, 931 [5 Cal.Rptr.3d 640] ["Undoubtedly, the expert's testimony alone would not have been sufficient to find the drug offense was gang related."].)
Here, Detective Hatfield's testimony in response to the two hypothetical questions violated the rule in Killebrew. The only apparent differences between the trial testimony and the hypothetical were the names of the parties. In the hypothetical question, the prosecution called the victim "young baby gangster" instead of Phanakhon and called the four defendants "three baby gangsters and one O.G.," that is, "original gangster." Indeed, one of the defense attorneys reported hearing "laughter or tittering from the jury" when Ha's defense attorney objected to the use of the hypothetical at an earlier stage in Detective Hatfield's testimony.
(8) The next question is whether the error was harmless, that is, whether there is enough evidence, including testimony that Detective Hatfield was permitted to offer concerning the general culture and habits of TOC (Gardeley, supra, 14 Cal.4th at p. 617), from which a reasonable jury could infer defendants committed the assault "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of section 186.22, subdivision (b)(1). (Gardeley, supra, 14 Cal.4th at p. 617.) The record reveals the following admissible evidence relevant to the issue of knowledge and intent. First, the phone call from an unidentified "familiar" voice, Vang's arrival and suggestion that they leave the garage to "hang out," and the assault by other known gang members at a nearby corner could support an inference that Phanakhon was "set up." Second, Phanakhon's two "guesses" for why he was assaultedthat he had disassociated himself from TOC or heard something he was not supposed to hear linked the assault to the gang. Indeed, Phanakhon testified that although he *323 was not afraid of defendants, he was afraid of TOC. Third, Detective Collins observed that the victim of the assault did not fight back, consistent with the theory that the beating was some kind of group punishment rather than a simple fight between Phanakhon and Vang as portrayed by Sitthideth. Applying the Watson standard of prejudicenot the substantial evidence standard of reviewwe conclude on this record that it is not reasonably probable that an outcome more favorable to defendants would have resulted in the absence of the evidentiary error. (People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

B. Sufficiency of the Evidence to Support the True Finding

Our conclusion that the error in admitting Detective Hatfield's testimony on defendants' knowledge and intent was harmless also supports the conclusion there was sufficient evidence to support the jury finding that the special gang allegation was true. (§ 186.22, subd. (b)(1).)
When a defendant challenges the sufficiency of the evidence, we "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidenceevidence that is reasonable, credible and of solid valuesuch that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Kraft (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68] (Kraft), citing People v. Johnson (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) We presume in support of the judgment existence of every fact the jury could reasonably deduce from the evidence. (People v. Pensinger (1991) 52 Cal.3d 1210, 1237 [278 Cal.Rptr. 640, 805 P.2d 899] (Pensinger).) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (Kraft, supra, 23 Cal.4th at pp. 1053-1054.)
Both Lê and Sitthideth assert that Phanakhon disclaimed membership in TOC and, after excluding the improper opinion testimony, there was no other evidence to support Detective Hatfield's opinion to the contrary. Lê argues that the evidence showed only that Phanakhon was an acquaintance of defendants and there was no other evidence to show the purported retaliatory assault on him was for the benefit of or with the intent to promote TOC. The record does not support these arguments.
As we explained, there was evidence apart from Detective Hatfield's inadmissible testimony from which a reasonable jury could infer the facts *324 necessary to prove the gang enhancement. (See, ante, at pp. 322-323.) In addition, the presence of Lê at the scene, whose tattoos led Detective Hatfield to opine he was an "Original Gangster" or "shot caller," also supports the retaliation theory. Regardless of whether Phanakhon was an actual member of TOC or merely an associate with some knowledge of gang activities, a reasonable jury could conclude that the purpose of the attack was the same, that is, to maintain discipline for the benefit of the gang. Thus, we conclude that evidence apart from Detective Hatfield's inadmissible opinion on defendants' knowledge and intent, and the inferences reasonably drawn from that evidence, were sufficient to sustain the true findings.

II. Motion to Bifurcate Trial of the Gang Enhancement

Defendants moved in limine to bifurcate the gang enhancement allegations from the trial of the underlying assault. Alternatively, Ha represented that he would stipulate that TOC met the statutory definition of a criminal street gang, and that he was a gang member, thereby obviating the need for prejudicial expert testimony on the details of defendants' involvement in the gang. Defendants argue that the court abused its discretion in denying the motion. We conclude the ruling was proper.
(9) In People v. Hernandez (2004) 33 Cal.4th 1040 [16 Cal.Rptr.3d 880, 94 P.3d 1080] (Hernandez), the Supreme Court described the possible prejudice where a gang enhancement allegation is tried at the same time as the substantive crime. "The predicate offenses offered to establish a `pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (Hernandez, supra, at p. 1049.) At the same time, evidence of gang culture, habits and membership is often relevant and admissible as to the charged offense. Thus, "[e]vidence of the defendant's gang affiliationincluding evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the likecan help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (Id. at pp. 1049-1050.) The Supreme Court concluded that "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itselffor example, if some of it might be excluded under Evidence Code section 352 as unduly *325 prejudicial when no gang enhancement is chargeda court may still deny bifurcation." (Hernandez, supra, at p. 1050.) As with motions for severance, the burden is on the defendant to persuade the court that considerations favoring a single trial "`are outweighed by a substantial danger of undue prejudice,'" and the decision to bifurcate is left to the trial court's discretion. (Id. at pp. 1048-1050.)
Here, the court observed that even without the gang enhancement allegation, gang evidence would likely come in to show defendants' motive for assaulting Phanakhon, and it wondered how much time would actually be saved by bifurcation. Based on the considerations identified in Hernandez, the court carefully questioned the prosecutor about the evidence she intended to introduce, including evidence on the predicate offenses. It then expressed concern that one of the predicate offenses involved a gang member with the same last name as defendant Danny Lê, but unrelated to him, who pleaded guilty to assault with a deadly weapon. The court ultimately ruled that as long as someone was prepared to provide a nonhearsay factual summary of that predicate offense which omitted reference to the victim being shot eight or nine times, it would not bifurcate trial of the gang enhancement allegations. On this record, we conclude there was no abuse of discretion.

III. Exclusion of Defense Evidence

Defendants challenge two evidentiary rulings apart from those we already considered in connection with the gang expert's opinion testimony. They assert that the trial court erred in excluding (1) Phanakhon's methamphetamine use and (2) a defense video of the crime scene at night. We conclude that both rulings were correct.

A. Evidence of Phanakhon's Methamphetamine Use

Sitthideth asserts that the court's exclusion of evidence of Phanakhon's methamphetamine use violated his due process right to present a complete defense and the right to confront and cross-examine witnesses. Specifically, he contends the court improperly precluded him from questioning Phanakhon about his prior drug-related arrest and the role of methamphetamine in the fight with Vang, and therefore prevented Sitthideth from fully presenting his version of events to the jury. Sitthideth maintains that the excluded evidence would have provided a non-gang-related motive for the fight, explained Phanakhon's apparent loss of consciousness and difficulty speaking, and undermined Phanakhon's credibility and the prosecution's case against Sitthideth. We conclude: (1) Sitthideth failed to preserve the issue of Phanakhon's methamphetamine use; (2) in any event, the court did not abuse its discretion in excluding evidence of past and current drug use; and *326 (3) defense counsel's failure to preserve Sitthideth's claim of error did not constitute ineffective assistance of counsel.
The prosecution moved in limine to exclude evidence of Phanakhon's prior drug use. At the same time, Sitthideth filed an in limine motion to allow the defense to cross-examine Phanakhon about a March 28, 2008 drug-related arrest. The trial court observed at the hearing that the victim's prior drug use was irrelevant, and continued: "If there was a basis to believe that he had drugs in his system at the time of the incident, then that would be something we should talk about." Lê's counsel responded that Phanakhon's vital signs after the assault were consistent with methamphetamine use, but noted that no "tox screens" were done on the victim. Vang's counsel added that there was a "possibility" that his client could testify that Phanakhon admitted ingesting methamphetamine the night of the attack. The court rejected that suggestion as speculative, and responded that Phanakhon's elevated vital signs were also consistent with his having just been attacked. Contrary to Sitthideth's representation on appeal, no one argued at the in limine hearing that there was evidence that a dispute over drugs precipitated the fight. The court ruled that pending Vang's decision to testify, and absent any solid evidence of Phanakhon's drug use the night of the attack, references to past or present methamphetamine use would be excluded as irrelevant. It also ruled the misdemeanor drug charge was inadmissible for purposes of impeachment.
Vang testified in compliance with the court's rulings, avoiding any reference to Phanakhon's past or present drug use. Sitthideth's testimony for the defense moved closer to the line. On direct examination he stated that while defendants were in the garage, Phanakhon brought "something" out of his pocket. Sitthideth did not elaborate on the nature of the "something," but continued: "I don't know if I can say it or not here." The prosecutor objected, saying: "I think there has been a prior ruling in this regard." Without ruling on the objection, the court asked defense counsel to restate the question. The following exchange took place:
"[DEFENSE COUNSEL]: I think the question was what happened next?
"THE COURT: What happened next?
"[SITTHIDETH]: After he brought the stuff out of his pocket?
"THE COURT: Yes.
"[SITTHIDETH]: They started arguing, calling each other names and stuff."
*327 At no time did defense counsel proffer new evidence of Phanakhon's drug use the night of the attack, argue its relevance in precipitating the fight, or otherwise challenge the court's in limine rulings. Accordingly, Sitthideth forfeited his challenge to the exclusion of evidence of Phanakhon's drug use. (People v. Jennings (1988) 46 Cal.3d 963, 975, fn. 3 [251 Cal.Rptr. 278, 760 P.2d 475].) "The reason for this rule is that until the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility." (Ibid.) For the same reason, we reject Sitthideth's argument that any objection or offer of proof would have been futile.
(10) Sitthideth blames trial counsel for his failure to make "timely and specific objections" regarding admissibility of evidence showing Phanakhon's present or past methamphetamine use. In reviewing a claim of ineffective assistance, we begin with the presumption "that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (People v. Holt (1997) 15 Cal.4th 619, 703 [63 Cal.Rptr.2d 782, 937 P.2d 213].) To prove ineffective assistance, Sitthideth must show that (1) counsel's performance fell below an objective standard of reasonableness based on the performance expected of a reasonably competent attorney and (2) he was prejudiced in that there is a reasonable probability the result would have been different absent counsel's unprofessional errors. (Strickland v. Washington (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 104 S.Ct. 2052] (Strickland); People v. Berryman (1993) 6 Cal.4th 1048, 1081 [25 Cal.Rptr.2d 867, 864 P.2d 40] (Berryman), overruled on a different ground in People v. Hill (1998) 17 Cal.4th 800, 822-823 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Sitthideth fails to establish either prong of the Strickland test.
(11) The record does not reveal the reasons trial counsel failed to renew his objection to the in limine rulings and/or argue the relevance of drugs in Sitthideth's account of the event. The point where the prosecutor reminded the court of the ruling regarding Phanakhon's current drug use would have been an appropriate time to do so. Absent more, we can only presume that Sitthideth's counsel had no new, relevant and nonspeculative evidence to offer, or had tactical reasons for not pursuing the matter. If the record on appeal fails to show why counsel acted or failed to act in the manner challenged, we will affirm unless counsel was asked for an explanation and failed to provide one, or there "`"simply could be no satisfactory explanation . . ." . . . .' [Citation.]" (People v. Mendoza Tello (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) And where the record is silent on these points, a claim of ineffective assistance is more appropriately pursued in a petition for writ of habeas corpus. (Id. at pp. 266-267.)
*328 In any event, Sitthideth fails to show that he was prejudiced by the court's decision to exclude references to Phanakhon's methamphetamine use or evidence suggesting that the drugs precipitated the argument that led to the fight. The trial court was correct in ruling that Phanakhon's prior drug use was irrelevant. After speculating at the hearing on in limine motions that Phanakhon's vital signs were consistent with current methamphetamine use, defendants never made an offer of proof at trial that methamphetamine could cause a person to fall in and out of consciousness or that Phanakhon was under the influence of methamphetamine at the time of the attack. Moreover, Sitthideth's account of the events of the night was unconvincing in the face of other evidence introduced at trial. His testimony that all the defendants were hanging out in Phanakhon's garage contradicted Phanakhon's testimony that only Vang and Lê were present. And his testimony that the fight was between Vang and Phanakhon was inconsistent with Detective Collins's and Officer Dewitt's observations that Phanakhon never threw a punch and was assailed by the four others who were present. Sitthideth exaggerates the potential impact of Phanakhon's drug use in the face of this and other evidence that supports the verdicts. And it was irrelevant whether Vang and Phanakhon argued over drugs, women or who would pay for the pizza, inasmuch as the jury rejected Sitthideth's testimony that it was only a fight between the two of them and not gang related.

B. Rulings on Pictures of the Scene of the Assault

Sitthideth next contends that the court abused its discretion and violated his due process rights by excluding a video of the crime scene at night and admitting daylight photos of the same location. He argues that the rulings resulted in the jury having a one-sided and misleading impression of what Detective Collins could see through his side view mirror the night of the assault. We conclude there was no abuse of discretion in either ruling, and reject Sitthideth's argument that the combined rulings warrant reversal.
Ha's defense counsel asked an investigator to prepare a video to recreate what Detective Collins would have seen through his side view mirror the night of the assault. It was offered to help the jury understand what the lighting would have been like and to cast doubt on Detective Collins's description of the events. At the Evidence Code section 402 hearing, Detective Collins testified that the video was too dark and out of focus, and did not accurately depict what he saw that night. Detective Collins described the location of the street lights and testified that the scene was backlit. In response to further questioning by the court, Detective Collins stated that the street lights allowed him to distinguish figures but not faces of those involved in the assault. At the close of Detective Collins's testimony, the prosecutor argued that the video was not relevant because it did not accurately depict the *329 lighting conditions at scene of the crime. She also asserted that the video's depiction of the street lights as specks was misleading based on common experience that street lights illuminate an area, and maintained the video should be excluded under Evidence Code section 352. The court agreed with the prosecution and excluded the video as "fundamentally misleading."
At trial, Detective Collins testified that the group of guys was backlit. He determined they were males, but he could not see anyone's face. Detective Collins stated that the victim and two of the assailants were wearing hoodies, but he could not distinguish any other details of their appearance. Later in Detective Collins's testimony, the prosecutor sought to introduce three daylight photographs taken of the crime scene two days before from Detective Collins's actual vantage point. She argued there was no prejudice because the photographs were substantially similar to photographs previously provided. Ha's defense counsel objected on grounds the prosecution was attempting to create new evidence after the close of discovery in response to what was going on at trial. The court overruled the objection, stating there was no discovery violation because the evidence was obtained in response to matters that developed during defense cross-examination. At the point in redirect when the prosecution questioned Detective Collins about the new photographs, Lê's defense counsel made an unspecified objection and requested a sidebar, but the court overruled the objection. Counsel did not put the basis for his objection on the record.
(12) We begin with the rule that only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has broad discretion in deciding whether challenged evidence is relevant and therefore admissible. (People v. Babbitt (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253].) In exercising its discretion to admit or exclude evidence, the court must at times consider the constraints of Evidence Code section 352, under which evidence is excluded if its probative value is outweighed by undue prejudice. In this context, the term "prejudice" refers to evidence "`which uniquely tends to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues.'" (People v. Wright (1985) 39 Cal.3d 576, 585 [217 Cal.Rptr. 212, 703 P.2d 1106].) "Prejudicial" is not synonymous with "damaging." (People v. Karis (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) We review rulings on relevance and undue prejudice for abuse of discretion. (People v. Kipp (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; People v. Cain (1995) 10 Cal.4th 1, 33 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)
(13) In People v. Gonzalez, supra, 38 Cal.4th 932, the Supreme Court upheld exclusion of the defendant's videotape of the crime scene. (Id. at *330 p. 952.) It explained that "`To be admissible in evidence, an audio or video recording must be authenticated. [Citations.] A video recording is authenticated by testimony or other evidence "that it accurately depicts what it purports to show." [Citation.]' [Citation.] `In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them.' [Citation.]" (Ibid.) Here, the testimony at the Evidence Code section 402 hearing supports the court's determination that the video proffered by the defense did not accurately depict what Detective Collins would have seen the night of the assault. For that reason, it was not relevant and would not assist the jury in deciding the facts of the case. The investigator had attempted in the first part of the video to replicate Detective Collins's view through the side view mirror. As Detective Collins testified, the first part of the video was dark and "so blurry you can't even see down the street." The court noted that "it doesn't take an expert to know that the problem there is that the picture was being taken through a mirror and the auto focus doesn't know whether to focus on the image in the mirror or the bezzle [sic] around the mirror, and so it is totally out of focus." The camera angle shifted in the second half of the video, but the scene was still darker than it appeared in real life. The court again noted the difference between a video camera and the human eye. "[T]he camera can't see the range of contrast the human eye can. So a simple answer to this is anybody who's ever been in a residential street at night knows that you can see more than what can be seen in this picture." The court concluded that it was not "fair or accurate" to say that "this faithfully shows what the scene would look like to a human being on the scene . . . ."
As to the three photographs introduced during redirect examination of Detective Collins, the defense unsuccessfully objected on grounds they violated discovery rules. Because the defense never objected to the photographs on grounds they were "much more `misleading' than anything offered by the defense," the issue is forfeited. (Evid. Code, § 353; see People v. Partida (2005) 37 Cal.4th 428, 433-434 [35 Cal.Rptr.3d 644, 122 P.3d 765].) There can be no serious argument that admission of the three photographs prejudiced defendants, and therefore we also reject Sitthideth's claim that failure to object constituted ineffective assistance of counsel.

IV. Sufficiency of the Evidence of Assault

Defendants contend there is insufficient evidence to support two additional aspects of the verdicts: (1) Lê's conviction of assault in the face of evidence he was a bystander and (2) defendants' conviction of assault with force likely to produce great bodily injury. Applying the standard of review set forth in *331 Kraft, supra, 23 Cal.4th at page 1053, we conclude there is substantial evidence to support the guilty verdicts.

A. Lê's Conviction for Assault

The information charged defendants with assault "with a deadly weapon or instrument . . . or by any means of force likely to produce great bodily injury . . . ." (§ 245, subd. (a)(1).) Lê contends there is no evidence to show he was involved in the beating of Phanakhon and therefore the evidence did not support his conviction for assault. He notes that the officers who witnessed the assault indicated that Lê was on the sidewalk in the shadows along a fence away from where his codefendants were assaulting Phanakhon in the street. Thus, the only evidence to suggest he was an aider and abettor in the assault was Detective Hatfield's testimony that, based on his tattoos, he was an "O.G." and "shot caller." Lê adds that "the court's errors with respect to the gang enhancement also render invalid [his] conviction for the assault." We disagree.
The prosecutor argued that Lê was criminally liable for the assault as a direct participant based on Officer Dewitt's testimony that he saw four men beating Phanakhon when he drove up to the scene. Although the court instructed the jury on aider and abettor liability, the prosecutor did not present that theory in her closing remarks and there is no indication the prosecution argued anything other than Lê's direct physical involvement in the crime. The jury was left with the task of resolving the conflict in the number of assailants and the jury resolved it against Lê. We conclude there is sufficient direct and circumstantial evidence, including the admissible testimony of Detective Hatfield, to support the verdict.

B. Assault with Force Likely to Produce Great Bodily Injury

Next, Sitthideth contends there is insufficient evidence to support defendants' conviction of assault "by any means of force likely to produce great bodily injury" (§ 245, subd. (a)(1)), because the prosecution failed to prove that "the force used was likely to cause great bodily injury . . . ." (Original italics.) In support of this argument, he notes that the jury found not true the special allegations that defendants used a deadly weapon and personally inflicted great bodily injury in the commission of the assault. Alternatively, Sitthideth contends the court had a duty to clarify the meaning of "great bodily injury" when asked by the jury. Neither argument has merit.

1. Elements of the Crime

(14) Section 245, subdivision (a)(1) punishes an assault committed "by any means of force likely to produce great bodily injury . . . ." No weapon or *332 instrument is required and the criminal force often consists of kicks or blows by the fist. (See People v. Tallman (1945) 27 Cal.2d 209, 212 [163 P.2d 857].) "Although neither physical contact nor injury is required for a conviction, if injuries result, the extent of such injuries and their location are relevant facts for consideration." (People v. Beasley (2003) 105 Cal.App.4th 1078, 1086 [130 Cal.Rptr.2d 717].) The question at trial is whether the force was likely to produce great bodily injury, and whether the victim actually suffered harm is immaterial. (People v. Aguilar (1997) 16 Cal.4th 1023, 1028 [68 Cal.Rptr.2d 655, 945 P.2d 1204].) Thus, in People v. Hahn (1956) 147 Cal.App.2d 308 [305 P.2d 192], the court found sufficient evidence of aggravated assault under section 245, where the defendant struck the victim on the head four times with a beer can. The victim never lost consciousness and the cuts on his head did not require sutures or followup treatment. (Hahn, at pp. 309-311.) The court explained: "While the wounds on [the victim's] head did not appear to be incurable, they were such as to require medical attention and because life-long nervous disorders are known to have resulted from no more violence than was applied to [the victim], it required no great strain of the deductive processes to infer that the force used upon him was `likely to produce great bodily injuries.'" (Id. at p. 312.) Whether or not the force used was likely to produce great bodily injury is a question of fact based on all the evidence, including but not limited to evidence of the injury actually inflicted. (People v. Chavez (1968) 268 Cal.App.2d 381, 384 [73 Cal.Rptr. 865].)

2. The Record Supports the Verdicts

Sitthideth cites the testimony of various officers along with hospital records to support his claim that Phanakhon's injuries were "simple injuries" and "not the type of great or serious injury" contemplated by section 245, subdivision (a)(1). He also argues there was no evidence that he personally hit Phanakhon or actively aided and abetted anyone else's assault on Phanakhon. Sitthideth's argument does not directly address the question whether there was evidence from which a jury could reasonably infer defendants' actions were likely to produce great bodily injury.
The record in this case shows that defendants beat Phanakhon. Although Phanakhon was crouching on the curb when Officer Dewitt arrived at the scene, his condition appeared to worsen as the other officers arrived. Officer Resch described Phanakhon as "out of it" and "slipping in and out of consciousness" when he placed handcuffs on Phanakhon. Detective Collins approached to find Phanakhon handcuffed, on the ground, nonresponsive, and breathing heavily. After Detective Collins applied a sternum rub, Phanakhon partly revived, but was unresponsive to questions and provided only garbled responses. Detective Collins observed that the left side of Phanakhon's face had already begun to swell. Photos taken at the hospital revealed cuts and bruises on Phanakhon's head and face.
*333 Although Phanakhon's actual injuries did not turn out to be severe, defendants' beating left him unconscious. Whether defendants used a pipe, a stick or their fists, we conclude there is substantial evidence to support the jury's determination that they used force likely to produce great bodily injury. Moreover, the jury's findings that defendants did not personally inflict great bodily injury within the meaning of sections 12022.7, subdivision (a) and 1192.7, subdivision (c)(8) are not inconsistent with the guilty verdict on count 1 given the different statutory language in those enhancements.

3. Response to Jury's Request for Clarification

The court instructed on the elements of section 245 in accordance with CALCRIM No. 875, including proof that "[t]he force used was likely to produce great bodily injury." The instruction provided the following additional points for guidance of the jury: "No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence in deciding whether the defendant committed assault. And if so, what kind of assault. [¶] Great bodily injury means significant or substantial physical injury. It's an injury that is greater than minor or moderate harm." (Italics added.) The court also instructed the jury with CALCRIM No. 3160 which includes the same definition of great bodily injury, this time in the context of the section 1192.7 and section 12022.7 enhancements. During deliberations, the jury inquired: "Is there any further clarification on what is great bodily injury? What is considered mild or moderate vs. something greater?" Counsel agreed with the court's proposed response which the court then read to the jury:
"The law provides no more specific definition of Great Bodily Injury than what is in your instructions. The words `minor,' `moderate' and `great' as well as `significant' and `substantial' as used in the instruction (number 3160) have no special legal meaning. They are to appl[y] using their ordinary, everyday meanings.
"Whether the injuries are `great' as opposed to `minor' or `moderate' is a factual judgment for you to make. In order for you to find the allegation true, you must unanimously find that it has been proved beyond a reasonable doubt."
Sitthideth contends that the court had a mandatory duty to define "great bodily injury" in response to the jury's request for clarification. He argues that the court was mistaken in saying the law gives no special meaning to the term, and continues: "Had the jury known simple injury is that requiring special medical attention and `great bodily injury' is substantially greater than that, it is reasonably likely [Sitthideth] would have been found not guilty of the charge in Count 1 or of only the lesser-included simple assault charge."
*334 Sitthideth forfeited any claim of error by agreeing to the court's written response. (People v. Bohana (2000) 84 Cal.App.4th 360, 373 [100 Cal.Rptr.2d 845], citing People v. Rodrigues (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1].) We nonetheless consider and reject his argument on the merits in light of his claim of ineffective assistance of counsel.
(15) The trial court has a duty to instruct sua sponte on "general principles of law that are closely and openly connected with the facts presented at trial" (People v. Ervin (2000) 22 Cal.4th 48, 90 [91 Cal.Rptr.2d 623, 990 P.2d 506]), including terms that have a "technical meaning peculiar to the law" (People v. Reynolds (1988) 205 Cal.App.3d 776, 779 [252 Cal.Rptr. 637], disapproved in part on a different ground in People v. Flood (1998) 18 Cal.4th 470, 480 [76 Cal.Rptr.2d 180, 957 P.2d 869].) The duty to elaborate or clarify does not extend to nontechnical terms such as "great bodily injury." (People v. La Farque (1983) 147 Cal.App.3d 878, 886-887 [195 Cal.Rptr. 438] (La Farque).) Moreover, if "the original instructions are themselves full and complete . . .," the question whether additional explanation is required "to satisfy the jury's request for information" is a matter left to the trial court's discretion. (People v. Gonzalez (1990) 51 Cal.3d 1179, 1213 [275 Cal.Rptr. 729, 800 P.2d 1159].) Indeed, "`comments diverging from the standard are often risky. [Citation.]'" (People v. Solis (2001) 90 Cal.App.4th 1002, 1015 [109 Cal.Rptr.2d 464] (Solis); see People v. Montero (2007) 155 Cal.App.4th 1170, 1179 [66 Cal.Rptr.3d 668] [court did not abuse its discretion in advising the jury to reread the form instruction].) At the same time, courts have cautioned that "`[a] definition of a commonly used term may nevertheless be required if the jury exhibits confusion over the term's meaning. [Citation.]' [Citation.]" (Solis, supra, 90 Cal.App.4th at p. 1015; see, e.g., People v. Ross (2007) 155 Cal.App.4th 1033, 1047 [66 Cal.Rptr.3d 438] [where self-defense at issue in prosecution for assault and battery, court erred in failing to instruct on the meaning of "mutual combat"].)
(16) "Great bodily injury," the term at issue here, "has been used in the law of California for over a century without further definition and the courts have consistently held that it is not a technical term that requires further elaboration." (La Farque, supra, 147 Cal.App.3d at pp. 886-887.) Our courts have also rejected the claim that the term "great bodily injury" is unconstitutionally vague and overbroad as used in sections 245 and 12022.7. (See People v. Guest (1986) 181 Cal.App.3d 809, 812 [226 Cal.Rptr. 525]; People v. Roberts (1981) 114 Cal.App.3d 960, 962-963 [170 Cal.Rptr. 872] (Roberts).) In Roberts, which also rejected the claim that the court should have instructed sua sponte on the meaning of "great bodily injury," the court explained:
"In our case, the kicking on the head and torso of a largely defenseless man on the ground appears to us to be unmistakably an assault which a jury *335 could reasonably find was likely to produce great bodily harm. And here, of course, the injuries inflicted bear out that fact. In addition to the cuts and bruises and the unconsciousness produced, the victim received a blow to the forehead which produced a large welt. If this blow had struck the nearby eye, it might well have produced blindness in that eye, surely a great bodily injury.
"We do not believe that any instructional amplification on the words `likely' or `great bodily injury' would have significantly enlightened the jury. In the last analysis, it is the jury's province to determine what the ultimate product of the assault might have been. It was clearly within the jury's province to determine that appellant intended to kick his victim with whatever force was required to permit appellant to accomplish his purpose, the robbery of his victim. No amount of `hair splitting' would or should have deterred the jury from its task of deciding whether the assault as the jury heard it described was likely to have resulted in `great bodily injury.'" (Roberts, supra, 114 Cal.App.3d at p. 965.)
Based on the foregoing, we conclude the court did not abuse its discretion in responding to the jury's request for clarification of "great bodily injury" in this case by directing it to consider the "ordinary, everyday" meaning of the term as set forth in the "full and complete" instructions on assault. Accordingly, counsel's performance did not fall below that expected of a reasonably competent attorney, and Sitthideth did not receive ineffective assistance. (Strickland, supra, 466 U.S. at pp. 687-688, 693-694; Berryman, supra, 6 Cal.4th at p. 1081.)

V. Ha's Probation Condition

Ha's probation order included the following condition: "Not be in possession of any cell phone or paging device except in course of lawful employment." Ha contends the condition is facially overbroad and therefore unconstitutional. The Attorney General responds that Ha is challenging the condition as applied and forfeited it by failing to object on that ground at sentencing. However, the parties nonetheless agree that we can resolve the issue by modifying the probation condition to read: "Not use a cell phone to communicate with any known gang member, or a paging device, except in the course of lawful employment." We agree that modification is appropriate.

VI. Review of Pitchess Materials

Before trial, Ha filed a Pitchess motion in which he sought discovery of the personnel records of Officer Scott Holden and Officer Michael Dewitt. The court reduced the scope of the request in response to the People's opposition, *336 and reviewed the records in camera to determine whether there were any discoverable files, specifically: (1) as to Officer Holden, files showing "excessive force, aggressive conduct, unnecessary violence, unnecessary force . . . [or] false statements in reports" and (2) as to Officer Dewitt, files showing "false statements in reports." The court determined that nothing was discoverable as to Officer Dewitt, but ordered release of the names, addresses and phone numbers contained in one file pertaining to Officer Holden.
On appeal, Ha asks that we review the materials in camera to determine whether the court followed the procedures set forth in People v. Mooc (2001) 26 Cal.4th 1216, 1226-1229 [114 Cal.Rptr.2d 482, 36 P.3d 21], and made the required-on-the record inquiry. We reviewed the officers' personnel records in camera and are satisfied that the court complied with Mooc.

DISPOSITION
Ha's probation order is modified and the court is directed to amend item 12G of that order to read: "Not use a cell phone to communicate with any known gang member, or a paging device, except in the course of lawful employment." The judgment is affirmed as modified.
McConnell, P.J., and O'Rourke, J., concurred.