Filed 11/14/14  P. v. Silva CA2/3
Opinion following second remand from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JESSE SILVA,<br><br>        Defendant and Appellant. | B225127<br><br>(Los Angeles County<br>Super. Ct. No. PA062172) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed in part, vacated in part, and remanded with directions.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Jesse Silva appeals from the judgment entered following his convictions by jury on two counts of first degree murder (Pen. Code, § 187;[1] counts 1 & 3), each with a multiple murder special circumstance (§ 190.2, subd. (a)(3)) and a gang special circumstance (§ 190.2, subd. (a)(22)), and on count 4 – attempted willful, deliberate, and premeditated murder (§§ 664,187) with, as to each of the above offenses, findings appellant personally, and a principal, used a firearm, intentionally discharged a firearm, and intentionally discharged a firearm causing great bodily injury or death (former § 12022.53, subds. (b), (c), (d) & (e)(1)).

Appellant also appeals from the judgment entered following his convictions by jury on count 2 – discharge of a firearm with gross negligence (§ 246.3, subd. (a)) and count 5 – assault with a firearm (former § 245, subd. (a)(2)) with personal use of a firearm (former § 12022.5, subd. (a)).

The jury found each of the above offenses was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)), and the trial court found appellant suffered a prior felony conviction (§ 667, subd. (d)). The trial court resentenced appellant to prison for life without the possibility of parole, plus 80 years to life. After reconsideration of the matter in light of *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*),[2] we affirm the judgment in part, vacate the judgment in part, and remand the matter for resentencing with directions.

---

[1]     Unless otherwise indicated, subsequent statutory references are to the Penal Code.

[2]     This is the third opinion filed in this case. After the first opinion (*People v. Silva* (May 16, 2012, B225127) [nonpub. opn.] (*Silva I*)), our Supreme Court granted review and transferred the matter to this court for reconsideration in light of *Miller v. Alabama* (2012) 567 U.S. ___ [132 S. Ct. 2455] (*Miller*), a decision rendered after *Silva I*. Following reconsideration, we rendered our decision in *People v. Silva* (Dec. 28, 2012, B225127) [nonpub. opn.] (*Silva II*)). Our Supreme Court granted review and later transferred the matter to this court with directions to vacate our decision and reconsider the matter in light of *Gutierrez*, a decision rendered after *Silva II*. We vacate our decision in *Silva II*.

# FACTUAL SUMMARY

1. *People's Evidence.*

   a. *The 2007 Murder of Albert Molina, and Grossly Negligent Firearm Discharge (Counts 1 & 2).*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established in about 2005, Jovani Leiva met appellant, Michael DeLeon, and Marco Flores in Branford Park in Los Angeles County. Leiva knew appellant as Cholo (the Spanish word for gangster), DeLeon as Dreamer, and Flores as Diablo. Leiva knew DeLeon was a member of the Pacoima Trece (PT) gang and Flores was a member of the Orcas gang.

During the late hours of June 15, 2007, Leiva drove his car about two miles from Branford Park to a party at a house or apartment building at 12462 Osborne in Los Angeles County. The car had four passengers: appellant, DeLeon, Flores, and someone named Lalo. About 10:00 p.m., Leiva parked around the corner from the party. The party was being held in a gated area outside the house. While Leiva and Flores were walking to the party, Leiva saw the handle of a gun protruding from Flores's waistband.

The above five persons were joined by a sixth, and the group approached the gate. However, prior to entry, guests were required to submit to a patdown weapons search conducted by Albert Molina (a decedent) and David Delgado. Appellant and three companions refused to be searched and became boisterous. They yelled "Fuck Vineland" and "Veggies." Veggies was a derogatory term for the Vineland Boys gang. DeLeon yelled "Paca Trece" and Flores yelled "Orcas."

Appellant had one hand inside his shirt near his waist and his other hand holding a 40-ounce beer bottle. He was aggressive and told Delgado, "We are going to get in." Delgado replied, "no, you are not." Appellant threw the bottle at the gate, breaking the bottle. Appellant punched one of the people conducting the search and the gate was closed.

3

Leiva saw Flores remove a black revolver from his waistband and hand it to DeLeon. Leiva saw DeLeon fire the revolver three to five times in the air. Delgado testified it was appellant who fired the gun in the air, and appellant fired the gun once or twice. According to Leiva, appellant grabbed the gun from DeLeon and fired it three to five times towards the gate and crowd. When the shooting occurred, appellant, DeLeon, and Flores were saying their gang names. Before and during the shooting, the three were calling out gang names, including Pacoima. A bullet struck Molina in the chest, killing him.

After the shootings, Leiva, appellant, DeLeon, Flores, Lalo, and someone named Dan ran to and entered Leiva's car. Leiva drove, Flores was in the front passenger seat, and the rest were in the backseat. Leiva was driving them to Branford Park while they were trying to empty the gun. Flores took bullets from the barrel and threw them out the front passenger window. Leiva dropped off everyone at the park. At 1:10 a.m., on June 16, 2007, police arrived at the shooting scene. No bullet casings were present, a fact consistent with use of a revolver.

Los Angeles Police Officer Michael Yoro, a gang expert, testified PT was a criminal street gang. Paca was a shortened version of Pacoima. The addresses of 12462 Osborne and 8737 Roslyndale were in territory claimed by PT. PT members congregated at Branford Park. The Vineland Boys gang and Sanfer gang were rival gangs that PT hated the most. Appellant's driver's license reflected he had drawn a line through the letter V in his name. This indicated appellant perceived the Vineland Boys gang as his enemy. DeLeon and Flores were PT members.

Yoro opined it was not uncommon for members of the Pacoima Cayuga Street Locos (PCSL) gang to be friendly with PT members. If a PCSL member kept company with a PT member, it would not be unusual for the PCSL member to claim membership in PT before committing crimes. Disrespect towards a gang or gang member would not go unanswered, and the result could range from assault to homicide. The prosecutor posed a hypothetical question which essentially was based on evidence as to the killing of Molina and, in response, Yoro opined to the effect the Molina killing was committed for the

4

benefit of, at the direction of, or in association with, PT.  The killing was retaliation for persons preventing "members of our gang in which is a [PT] gang" (*sic*) from entering a party in their own neighborhood and territory and daring to search them knowing they could be armed.

b. *The 2008 Murder of Johnny Lopez, Attempted Murder of Marvin Maldonado, and Assault with a Firearm on Maldonado (Counts 3 – 5).*

On June 8, 2008, before 1:30 p.m., Johnny Lopez (a decedent) and Marvin Maldonado were drinking near Branford Park.  They finished drinking about 12:50 p.m.  About 1:30 p.m., they encountered appellant standing in the driveway of his home at 8737 Roslyndale in Arleta.  Lopez approached appellant and asked where he was from.  Appellant replied he was from PT.  Lopez asked, " 'So that's what's up?' "  Appellant indicated he recently had been released from juvenile hall and was having difficulty adjusting to society.  After talking with appellant for no more than five minutes, Lopez and Maldonado left.  Lopez returned to appellant and told him that he never asked Lopez where Lopez was from.  Lopez and Maldonado again walked away.

After walking about 200 feet from appellant's house, Maldonado saw appellant in the street riding a bright-colored bicycle towards them.  The bicycle was probably blue.  It was depicted in a photograph, People's exhibit No. 3.  Lopez entered the street and approached appellant, who had stopped in the street.  Maldonado testified Lopez said to appellant something to the effect Lopez "had spoken with his brother and that everything was cool."

During direct examination of Maldonado, the prosecutor began a question by commenting Maldonado had testified that after the defendant was on his bicycle, Lopez told "the defendant [appellant] . . . that he just talked to his brother."  Maldonado interrupted the prosecutor, stating, "I knew it was him."  The prosecutor asked if Maldonado knew "it was the same defendant" and Maldonado replied yes.  Maldonado knew "it wasn't some other guy. . . ."

Appellant asked Lopez where Lopez was from, and Lopez replied San Fer. Maldonado testified appellant then removed a silver semiautomatic handgun with a black grip from his waist, brandished the gun, and shot Lopez about six times. Lopez in fact sustained four gunshot wounds and was mortally wounded. Appellant turned the gun toward Maldonado and brandished it towards him. Maldonado fled. Appellant shot him in the back. During the shootings, appellant was wearing a white T-shirt, blue jeans, and a black glove on his left hand, the hand which held the gun. After the shootings, appellant rode away on the bicycle.[3]

About 1:30 p.m., on June 8, 2008, Heldrych Castillo was in his bedroom when he heard five or six gunshots. About a minute later, he looked out his window and saw a male juvenile quickly pedaling a bright blue BMX bicycle on Truesdale towards Canterbury. The juvenile was wearing a black glove on his right hand, which was holding a small silver handgun. Castillo went outside and saw a gunshot victim lying in the street. Castillo called 911 and described the shooter as a bald Hispanic wearing a white shirt and riding a blue bicycle. Jesus Ayungua, appellant's cousin, told a detective that on an occasion prior to June 8, 2008, Ayungua had seen a blue bicycle at appellant's house. The bicycle was the one, or looked like the one, depicted in People's exhibit No. 3. Police recovered seven .380-caliber bullet casings from the shooting scene. The location of the casings was consistent with the use of a firearm which ejected casings near Lopez.

---

[3]     On June 8, 2008, police showed Maldonado a photographic folder (People's exh. No. 15A). It contained a photograph of appellant. At the time, Maldonado selected a photograph depicting someone but said "he was older." The photograph Maldonado selected did not depict appellant. On June 10, 2008, police showed Maldonado another folder (People's exhibit 16A). He selected photograph No. 2, which depicted appellant, and Maldonado wrote, "Suspect looks like picture number two. I'm positive this is the suspect who shot me and Johnny . . . ." At appellant's preliminary hearing, Maldonado was shown People's exhibit No. 18 (a duplicate of People's exhibit 15A), and he selected from People's exhibit No. 18 appellant's photograph as depicting the person who shot Lopez. The photograph of appellant in People's exhibit No. 16A was taken on June 9, 2008. The photographs of appellant in People's exhibit Nos. 15A and 18 were taken some time in 2007.

On June 8, 2008, Joyce Salgado, appellant's then-girlfriend, spoke with him while he was in police custody, and police recorded the conversation. The following occurred: "[Appellant]: You know where I hide the bullets (Inaudible). [¶] [Salgado]: Uh-huh. [¶] [Appellant]: Why you know where [inaudible] when you go home, huh? (Inaudible Whispering) try to [inaudible] as soon as possible. Put the . . . bullets in the bag . . . . [¶] [Salgado]: Uh-huh. Put gun clips . . . . [¶] [Appellant]: And try to get it out . . . put gloves. And then that way I don't get caught. Put gloves, so you don't get shit on your hands, and clean the gun, please. Like that if they put it . . . back in the wall (Inaudible), and they just . . . try to throw it somewhere the [*sic*] going to be looking for it already at my mom's place. If you could do it. If not, then just leave it right there where it's at. Okay? [¶] [Salgado]: Uh-huh."

A detective testified that, during the conversation, appellant said "behind the wall in his room" and "behind the wall behind the shelf." Appellant said he was going to get locked up "for what happened," "[f]rom that shooting," and "they're trying to blame it on me" "[b]ecause, supposedly, I look like Michael."

On June 9, 2008, police searched appellant's house. During the search, Ayungua told a detective that on June 6, 2008, appellant showed Ayungua a gun and the gun was hidden within the walls. The bicycle depicted in People's exhibit No. 3, a white T-shirt, and blue jeans were found behind a brick wall in the backyard of appellant's house.

On July 18, 2008, Los Angeles Police Detective Heather Gahry listened to the tape of the conversation between appellant and Salgado. As a result, Gahry searched appellant's room, which was a renovated garage. Gahry found a black-knit glove in an opening in a wall in the room. The glove had the white letters P, C, S, and L written in sequence on the glove's four fingers, respectively. The letters stood for Pacoima Cayuga Street Locos.

Los Angeles Police Officer Fernando Avila, a PCSL gang expert, testified PCSL was a criminal street gang. PCSL derived from PT, and the two gangs were allies. Appellant was a PCSL member and bore its gang's tattoos.[4] Avila testified PCSL members advanced in the gang's hierarchy by "putting in work," i.e., committing certain crimes which benefitted the gang. When PCSL members murdered a rival gang member, this demonstrated loyalty to PCSL.

The prosecutor posed a hypothetical question based on evidence of the shooting of Molina and the shootings of Lopez and Maldonado. In response, Avila opined the only reason the June 8, 2008, murder victim was shot was he said San Fer, the killing was committed for the benefit of PCSL, and the fact the shooter associated with PT would let all other gangs know "guys from Pacoima are going to put in work, especially . . . murder." The shooting of the decedent's friend who merely had accompanied someone who had said San Fer would benefit the PCSL and PT gangs.

2. *Defense Evidence.*

During appellant's cross-examination of various People's witnesses, appellant marked for identification, inter alia, defense exhibits A, D, and E. Defense exhibit A was a photograph depicting DeLeon. Defense exhibit D was a "six-pack." Defense exhibit E was an admonition form.

After the People's presentation of evidence, and outside the presence of the jury, appellant indicated there would be no "defense witnesses." Later, in the presence of the jury, the People moved that their exhibits be admitted into evidence. The court admitted them into evidence, then asked appellant's counsel if there was "any defense." Appellant's counsel replied, "No, your Honor. We rest." However, the court then asked if appellant's counsel wanted admitted into evidence defense exhibits A, D, and E. Appellant's counsel

---

[4]     Yoro testified appellant had a tattoo with the letters PCSL on his right forearm, a tattoo with the letters CSL on his left hand, and three dots in the corner of one of his eyes. The three dots meant, "my crazy life." Avila testified the tattoos like the letters PCSL were a way of identifying oneself as a member of a criminal street gang.

8

replied, "I so move" and those three defense exhibits were admitted into evidence. The court later advised the jury the parties had rested.

We will present additional facts below where appropriate.

## *ISSUES*

Appellant claims: (1) the trial court erred by denying his severance motion, (2) the court erroneously denied his *Wheeler* motion, (3) the gang experts' testimony was inadmissible, (4) the court erroneously refused to instruct on voluntary intoxication as to count 1, (5) there was insufficient evidence supporting the gang special circumstance finding as to count 1, (6) the court improperly limited appellant's cross-examination of Yoro, (7) CALCRIM No. 736 is constitutionally defective, (8) cumulative prejudicial error occurred, (9) the court improperly denied appellant's motion for disclosure of juror identification information, (10) appellant's sentence constituted cruel and unusual punishment under the Eighth Amendment, (11) appellant's sentence constituted cruel or unusual punishment under the state Constitution, (12) imposition of a Three Strikes law sentence as to count 4 was improper, and (13) his section 1202.45 parole revocation fine must be stricken.

## *DISCUSSION*

1. *The Trial Court Properly Denied Appellant's Severance Motion.*

a. *Pertinent Facts.*

Appellant filed a pretrial motion to sever counts 1 and 2 (the 2007 offenses) from counts 3 through 5 (the 2008 offenses), and the People filed an opposition.[5] After argument on the motion, the court denied it on the following grounds. The murders were

---

[5] In the opposition, the People argued, inter alia, as follows. The 2007 and 2008 offenses were not remote from each other because appellant was in custody on an unrelated charge from November 2007 through May 2008. Appellant claimed he was with DeLeon at the time of the 2007 and 2008 incidents. The 2007 and 2008 offenses each had the modus operandi that appellant and his gang were disrespected and he retaliated by fatally shooting the offender. Evidence of the 2007 murder and the 2008 murder and attempted murder was mutually cross-admissible under Evidence Code section 1101, subdivision (b).

9

of the same class of crimes. In both sets of crimes, appellant was identified as the shooter and the victims were shot multiple times. Both sets of offenses were gang-related and involved the same codefendant. Evidence was cross-admissible. Expert testimony on firearms, gunshot residue, and gangs was cross-admissible. One murder would not inflame the jury with respect to another murder because the victims of both murders were young males.

Moreover, the court indicated neither set of offenses was substantially weaker than the other. In this regard, as to the 2007 offenses, appellant was identified by an accomplice and an eyewitness, and appellant was inculpated by his own admission. As to the 2008 offenses, appellant was identified as the shooter by an eyewitness who had an opportunity to observe appellant in broad daylight without threat of bodily harm when the eyewitness initially conversed with the victim and appellant. The eyewitness and victim were not alarmed when the defendant later approached them, so there was no question appellant was the shooter. Joinder promoted judicial economy. Section 954.1 expressly provided cross-admissibility was not required before jointly charged offenses could be jointly tried.

Reiterating evidence would be cross-admissible, the court stated, "[Appellant's] own statement, as well as them being gang-related incidents, would provide a basis for [Evidence Code section] 1101(b) evidence to be admitted into each trial anyway."

b. *Analysis.*

Appellant claims the trial court erroneously denied his severance motion. We disagree. The law prefers consolidation of charges. (*People v. Manriquez* (2005) 37 Cal.4th 547, 574.) When the statutory requirements for joinder are met, a defendant must clearly show prejudice to establish an abuse of discretion when a trial court fails to sever offenses. The pertinent factors to be considered are whether (1) the evidence of the crimes would be cross-admissible in separate trials, (2) some of the charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case so that the total evidence on the joined charges may

10

alter the outcome of some or all of the charged offenses, and (4) any one of the charges is a death penalty offense, or whether joinder converts the matter into a capital case.

A determination evidence is cross-admissible ordinarily dispels any inference of prejudice. (*People v. Marshall* (1997) 15 Cal.4th 1, 27-28 (*Marshall*).) (We refer to the above four factors as the *Marshall* factors.) Our review of a trial court's ruling on a severance motion is based on the record as it existed at the time of the ruling. (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.) Finally, even if a trial court has not abused its discretion in denying a pretrial severance motion, the judgment must be reversed if the defendant shows joinder resulted in gross unfairness amounting to a denial of due process. (*People v. Macklem* (2007) 149 Cal.App.4th 674, 698.)

In the present case, appellant concedes the statutory requirements for joinder were met. Appellant therefore has the burden of demonstrating prejudice. There was ample evidence each set of 2007 and 2008 offenses included a gang-related homicide in which appellant shot a young person(s), and shot at each decedent multiple times. As the court suggested in its comments concerning gang-related incidents and Evidence Code section 1101, subdivision (b), this gang-related evidence was mutually cross-admissible on the issues of appellant's gang-related motive to commit said offenses and intent to kill, and the evidence of the 2007 offenses was cross-admissible to prove premeditation and deliberation as to the 2008 murder. The above indicated cross-admissibility of the evidence dispels any inference of prejudice.

Moreover, as indicated by the trial court, the charges were similar and, as appellant concedes, none were unusually likely to inflame the jury against appellant. None involved a weak case. None was a death penalty offense, nor did joinder convert this case into a capital one. In sum, none of the *Marshall* factors compels a conclusion the denial of appellant's severance motion was an abuse of discretion. Nor does the record of the events after the denial demonstrate joinder resulted in gross unfairness amounting to a denial of appellant's right to due process. The trial court did not err, constitutionally or otherwise, by denying appellant's severance motion.

11

2. *The Court Trial Properly Denied Appellant's Wheeler Motion.*

   a. *Pertinent Facts.*

Voir dire of prospective jurors[6] revealed jurors 2575, 2937, 7351, and 4296 were married women, except for Juror 4296, who was a single woman. Only Juror 2575 had jury experience. All indicated they would be impartial jurors.

The prosecutor exercised peremptory challenges as to the above four jurors. The parties concede the prosecutor challenged a total of 10 jurors. After the prosecutor challenged Juror 4296, appellant brought a *Wheeler*[7] motion on the ground the prosecutor challenged the above four jurors because they were Hispanic women. The court replied, "Okay. People."

The prosecutor subsequently indicated as follows. When the oath was given to jurors, Juror 2575 did not say "I do." The prosecutor noticed this because Juror 2575 had been giving the prosecutor "hard looks from the very beginning." The prosecutor commented, "if the court recalls, I asked her if she was in any way mad at me or if I had done anything. Maybe it was just her way of thinking about things. She said no, but she continued the looks." During voir dire of a fireman, Juror 2575 rolled her eyes at the fireman at least three times. The prosecutor commented the prosecutor wrote "all of this down as I caught it going because I kept an eye on her because I couldn't, at first, understand why I was getting such dirty looks." The prosecutor did not believe Juror 2575 was a Hispanic female, and Juror 2575 may have been an African-American.

---

[6]    Subsequent references to jurors are to prospective jurors. Prior to voir dire, the court administered the oath to jurors, and the reporter's transcript reflects they collectively replied, "I do."

[7]    References to *Wheeler* are simultaneously to *People v. Wheeler* (1978) 22 Cal.3d 258, and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69], except where *Batson* is referred to expressly.

Juror 2937 initially had said she was from Pacoima and knew of no gangs there, but when the prosecutor individually questioned her, Juror 2937 changed and indicated she was not involved in gangs. Her brother or brother-in-law was incarcerated. The trial court stated Juror 2937 was very defensive when the prosecutor questioned her.

As to Juror 7351, the following occurred: "[The Prosecutor]: . . . I believe [Juror 7351] was the juror that explained about being jumped by gang members when she was in high school, and she seemed to say that she may have just gone to the wrong place to eat, but we talked to her about being fair because she had been jumped. She said, well, I have friends that are gang members, too. [¶] I tried to question her about her friends, and she said her sister had dated a gang member. When I asked her how she felt about that, she says well, it was love. [¶] And just the association and the friendships that are gathered from that, I didn't want someone with that close of a relationship to a gang members [*sic*], either past or present, to be in the present. [*Sic*.] Had nothing to do with her racial status. [¶] The Court: Also, she didn't bring that up when she was initially questioned. [¶] [The Prosecutor]: Yes, she did not. She brought it up only after she kind of said it in an answer to [defense counsel's] question, but initially she did not."

Juror 4296 was young and inexperienced. She left school in the ninth grade, she looked very young, and, apart from babysitting, she had no employment history. Juror 4296 lacked knowledge concerning gangs despite the fact she had lived in Van Nuys.

The prosecutor indicated a Hispanic woman was a jury member. The court agreed. The court denied appellant's *Wheeler* motion and excused Juror 4296.

b. *Analysis.*

Appellant claims the trial court erroneously denied his *Wheeler* motion. We disagree. In *People v. Wheeler*, *supra*, 22 Cal.3d 258, our Supreme Court stated, "[w]e conclude that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." (*Wheeler*, at pp. 276-277.) *Batson v. Kentucky*, *supra*, 476 U.S. 79 reached the same

13

conclusion based on the federal equal protection clause. (*People v. Huggins* (2006) 38 Cal.4th 175, 226.)

When a defendant asserts at trial that the prosecution's use of peremptory strikes violates the federal Constitution, the defendant must make out a prima facie case by showing the totality of the relevant facts gives rise to an inference of discriminatory purpose. The burden then shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Thereafter, if a race-neutral explanation is tendered, the trial court must decide whether the opponent of the strike has proved purposeful racial discrimination. The identical three-step procedure applies when the challenge is brought under the California Constitution. (*People v. Cowan* (2010) 50 Cal.4th 401, 447.) The same principles apply to group bias based on gender. Appellant concedes Hispanic women are a cognizable group for purposes of *Wheeler* analysis. (*People v. Garceau* (1993) 6 Cal.4th 140, 171; *People v. Gray* (2001) 87 Cal.App.4th 781, 788.)

Fairly read, the record reflects the court found appellant made a prima facie showing the prosecutor had exercised challenges as to the four above discussed jurors on the ground they were Hispanic women. At the court's suggestion, the prosecutor proffered justifications which were allegedly neutral, and the court then found appellant had not proved purposeful discrimination based on group bias.

Appellant asserts the trial court's finding was erroneous. However, our review of a trial court's denial of a *Wheeler* motion is deferential. We examine whether substantial evidence supports the trial court's conclusions. We review with great restraint a trial court's determination regarding the sufficiency of a party's proffered justifications, and we "give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the [alleged] nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*People v. Lenix* (2008) 44 Cal.4th 602, 614.) With these principles in mind, we review below the trial court's conclusions.

The prosecutor indicated she challenged Juror 2575 because Juror 2575 failed to say "I do" individually when the oath required by Code of Civil Procedure section 232, subdivision (a) was administered. That failure provided the prosecutor a ground to suspect Juror 2575 may not have been able to perform her duties as a juror in accordance with the required oath and the court's instructions. (Cf. *People v. McKinnon, supra,* 52 Cal.4th at p. 643.) This provided race- and gender-neutral bases to challenge Juror 2575. The prosecutor also indicated Juror 2575 gave the prosecutor "hard looks" and Juror 2575 repeatedly rolled her eyes during the voir dire of a fireman. Bare looks from a juror that may alienate a party can provide a neutral basis for a challenge. (*People v. Turner* (1994) 8 Cal.4th 137, 171.) "[P]eremptory challenges may turn upon perceptions not available to someone reading the cold record--the tone of voice, facial expression, body language, etc., of the prospective juror." (*People v. Lenix, supra,* 44 Cal.4th at p. 634.)

The prosecutor challenged Juror 2937 because Juror 2937 initially denied knowledge there were gangs in Pacoima, but later acknowledged she knew they existed there. Conflicts in a juror's statements during voir dire can provide a neutral basis for a challenge. (Cf. *People v. Jones* (1998) 17 Cal.4th 279, 293-294.) The prosecutor also challenged Juror 2937 because her brother was incarcerated. A prosecutor reasonably may conclude a "close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution." (*People v. Farnam* (2002) 28 Cal.4th 107, 138.)[8]

---

[8]    Appellant asserts as a basis for comparative analysis Juror 7892's brother suffered an arrest on narcotics charges but the prosecutor did not challenge Juror 7892. However, appellant does not assert the record demonstrates Juror 7892's brother was convicted and incarcerated. Juror 2937's brother was convicted and incarcerated. Conviction and incarceration of a juror's close relative provide neutral reasons for challenging the juror. (*Wheeler*, *supra,* 22 Cal.3d at p. 277, fn. 18.) Juror 7892 and 2937 were not similarly situated.

The prosecutor challenged Juror 7351 on the grounds, in part, her sister had dated a gang member and Juror 7351 said, inter alia, "it was love." "The 'law recognizes that a peremptory challenge may be based on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative.' " (*People v. Williams* (1997) 16 Cal.4th 153, 191.) Jurors may be excused based on hunches, and even arbitrary exclusion is permissible, so long as the reasons are not based on impermissible group bias. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122.) The prosecutor reasonably might have suspected Juror 7351 could have had a sympathetic attitude toward a gang member(s). A degree of sympathy by a juror towards gang members can provide a neutral reason for a challenge. (*People v. Rushing* (2011) 197 Cal.App.4th 801, 811.)

The prosecutor challenged Juror 4296 on the grounds she was young and inexperienced, she had no employment history other than babysitting, and she lacked knowledge concerning gangs even though she had lived in Van Nuys. Her youth and inexperience provided neutral reasons to challenge her. (Cf. *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328.) Similarly, unemployment is a proper criterion for exercising a challenge because unemployment suggests a person has little stake in the community. (Cf. *Stubbs v. Gomez* (9th Cir. 1999) 189 F.3d 1099, 1106; *United States v. Gibson* (8th Cir. 1997) 105 F.3d 1229, 1232, fn. 2.)

In the present case, the record demonstrates the trial court made a sincere and reasoned effort to evaluate the prosecutor's proffered justifications. The trial court's conclusion the prosecutor did not make challenges based on group bias towards Hispanic women was supported by substantial evidence. The trial court did not err by denying appellant's *Wheeler* motion.[9]

---

[9] *Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175] (*Snyder*), cited by appellant, does not compel a contrary conclusion since, unlike the case in *Snyder*, we as a reviewing court have not concluded any of the prosecutor's challenges were pretextual.

3. *The Gang Experts' Testimony Was Admissible.*

Appellant claims the gang experts' testimony was elicited through the People's impermissible hypothetical questions calling for the experts' opinion on whether appellant committed the offenses at issue for the benefit of, at the direction of, or in association with a criminal street gang for purposes of former section 186.22, subdivision (b). Appellant argues that, as a result, his conviction on count 1, and the true findings as to the former section 186.22, subdivision (b) enhancement allegations and the section 190.2, subdivision (a)(22) special circumstance allegations, must be reversed. Appellant concedes that, at the time he filed his opening brief, the issue he raises was pending review in our Supreme Court in *People v. Vang* (2010) 185 Cal.App.4th 309, review granted September 15, 2010 (S184212).

Appellant failed to object to the experts' testimony on the grounds he now asserts; therefore, he waived the issues. (Evid. Code, § 353, subd. (a)). Even if the issues were not waived, they lack merit. In *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), a gang expert, in response to hypothetical questions posed by a prosecutor, testified an assault would benefit a named gang and was committed in association with the gang and at the direction of the gang's members. The expert also testified the attack was gang-motivated. *Vang* concluded the prosecutor's hypothetical questions, although based on evidence-specific assumptions, were properly based on evidence at trial and the expert's opinion testimony in response was admissible and not rendered inadmissible by the fact, if true, that the testimony pertained to an ultimate issue(s) to be decided by the trier of fact. (*Id.* at pp. 1042-1049.)

In the present case, the prosecutor essentially posed hypothetical questions which asked the experts to assume various facts based on the evidence. The prosecutor's questions were proper and, in response, the experts properly gave their respective opinions. The expert opinion testimony was admissible (cf. *Vang, supra,* 52 Cal.4th at pp. 1042-1049), and no violation of appellant's Fifth, Sixth, and/or Fourteenth Amendment rights occurred.

Although appellant appears to assume it would have been error for the experts to testify directly about appellant himself, *Vang* expressly left open this question. (*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4.) However, there is no need to reach that issue since neither expert in this case testified directly about appellant or referred to him by name. The experts' use of the passive voice avoided express references to appellant. Accordingly, appellant asserts Yoro testified the crime "was committed" for the benefit, etc., of a gang, and Avila testified "both shootings were done" to benefit specified gangs. To the extent appellant claims he received ineffective assistance of counsel by reason of his trial counsel's failure to object to the experts' testimony, our analysis compels the conclusion no such ineffective assistance occurred.

4. *The Trial Court Properly Refused to Instruct on Voluntary Intoxication (Count 1).*

During cross-examination, Delgado testified that when appellant threw the bottle, it hit the gate "in front of us" and "like splashed all over us." Appellant drew the gun about 30 seconds or a minute later. Appellant later during cross-examination asked Delgado if appellant appeared drunk to Delgado. Delgado replied, "I don't know. He was holding a beer." Appellant asked if Delgado ever said appellant was drunk "to the police or anything like that . . . ." Delgado replied, "I probably said it because he had a beer in his hand, yes." Delgado added, ". . . he didn't seem like he was drunk out of his mind and didn't know what was going on because he was speaking . . . at me in plain English; no jibberish, no slurring at all."

During discussions concerning jury instructions, appellant's counsel requested an instruction on voluntary manslaughter as to count 1 on the ground "the defendant, due to intoxication, did not form the specific intent to kill." The prosecutor denied voluntary manslaughter could be based on intoxication and suggested another instruction might apply.[10] Appellant indicated the other instruction was CALCRIM No. 625 and he requested that the court give it.

---

[10]    In his opening brief, appellant states he is not challenging the trial court's refusal to instruct on voluntary manslaughter.

18

The proposed modified CALCRIM No. 625, as recited by the court, read: ". . . you may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation.  [¶]  A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance that could produce an intoxicating effect, or willingly assuming the risk of that effect.  [¶]  You may not consider evidence of voluntary intoxication for any other purpose."  Appellant's counsel indicated the instruction pertained to the issue that appellant "could not form the malice."  The court refused to give the proposed modified CALCRIM No. 625.

Appellant claims the trial court thereby erred, requiring reversal of his conviction on count 1.  We disagree.  We have recited the pertinent facts.  There was no substantial evidence appellant was intoxicated, voluntarily or otherwise.  Even if there was substantial evidence he was voluntarily intoxicated, there was no substantial evidence appellant became intoxicated to the point he failed to formulate the mental states at issue, i.e., intent to kill, and premeditation and deliberation.  (Cf. *People v. Marshall* (1996) 13 Cal.4th 799, 848; *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661-1662.)  A trial court is under no duty to give an instruction unsupported by substantial evidence.  (Cf. *People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

5. *Sufficient Evidence Supported Count 1's Gang Special Circumstance Finding.*

Appellant claims there is insufficient evidence supporting the gang special circumstance finding pertaining to count 1 (the Molina murder).  Appellant argues in particular there was insufficient evidence (1) appellant "knew that members of [PT] engaged in a pattern of criminal activity" and (2) appellant was a member of, or active participant in, PT.  We reject his claim.

Section 190.2, subdivision (a)(22) authorizes a defendant to be sentenced to death, or imprisonment for life without the possibility of parole, if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the

19

activities of the criminal street gang." Although section 190.2, subdivision (a)(22) does not expressly require that the defendant have "knowledge of the gang's criminal purposes" (*People v. Carr* (2010) 190 Cal.App.4th 475, 487 (*Carr*), federal due process imposes that knowledge requirement upon subdivision (a)(22). (*Ibid.*) The subdivision does not require that the defendant be an actual member of the gang.[11]

---

[11] In *Carr*, the defendant challenged the sufficiency of the evidence supporting the true finding as to his section 190.2, subdivision (a)(22) gang special circumstance allegation. The trial court in *Carr* (like the trial court in the present case) used CALCRIM No. 736 to instruct on the elements of that subdivision. The CALCRIM No. 736 instruction given in the present case was substantially the same as the one used in *Carr*. The instruction given in the present case stated, "The defendant is charged with the special circumstance of committing murder while an active participant in a criminal street gang in violation of Penal Code section 190.2(a)(22). [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed Albert Molina and [J]ohnny Ray Lopez; [¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; [¶] AND [¶] 4. The murder was carried out to further the activities of the criminal street gang. [¶] Active participation means involvement with a criminal street gang in a way that is more than passive or in name only. [¶] The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang, or that he was an actual member of the gang. [¶] A criminal street gang is defined in another instruction to which you should refer." Except for appellant's claim addressed in part 7 of our Discussion (a claim we there reject), there is no dispute the above quoted CALCRIM No. 736 correctly stated the law.

*Carr* concluded that, notwithstanding the third enumerated knowledge element in CALCRIM No. 736, section 190.2, subdivision (a)(22) itself did not expressly impose a knowledge element. (*Carr, supra,* 190 Cal.App.4th at p. 486.) However, *Carr* observed federal due process required a person could not be criminally liable for active membership in a criminal organization absent " 'guilty knowledge and intent' " (*id*. at p. 487); therefore, due process mandated that one of section 190.2, subdivision (a)(22)'s elements was that a defendant have "knowledge of the gang's criminal purposes" (*id*. at p. 487). *Carr* did not expressly eliminate the third enumerated knowledge element set forth in CALCRIM No. 736, but expressly construed that element to not require a defendant's "knowledge of particular crimes committed by gang members." (*Carr*, at p. 488, fn. 13.)

To the extent appellant argues there was insufficient evidence he "knew that members of [PT] engaged in a pattern of criminal activity," we reject the argument. Section 190.2, subdivision (a)(22) required appellant to have knowledge of the gang's criminal purposes, but did not require appellant to have knowledge of the particular crimes committed by gang members (see fn. 11, *ante*). We have set forth in the Factual Summary the pertinent evidence, including appellant's conduct during the 2007 Molina murder (e.g., his shouting Pacoima) and appellant's membership in PCSL, the expert testimony concerning the relationship between PCSL and PT (including the facts PCSL derived from PT, and the two gangs were allies), and Yoro's expert opinion testimony the killing of Molina was committed for the benefit of, at the direction of, or in association with, PT. Such evidence and testimony are typical proofs of gang allegations. (*Carr*, *supra*, 190 Cal.App.4th at pp. 488-489, fn. 14.) We conclude there was sufficient evidence appellant had knowledge of the PT gang's criminal purposes as required by the gang special circumstance pertaining to count 1. (*Id*. at pp. 488-490.)

To the extent appellant argues there was insufficient evidence he was a member of PT, we reject the argument. Section 190.2, subdivision (a)(22) does not expressly require that the defendant be a member in a gang. Except as previously discussed, there is no dispute CALCRIM No. 736 given in this case correctly states the law. That instruction states, "The People do not have to prove that the defendant . . . was an actual member of the gang." To the extent appellant argues there was insufficient evidence appellant was an active participant in PT, we reject the argument based on the previously discussed evidence and expert testimony.

6. *The Court's Limitation on Appellant's Cross Examination of Yoro Was Proper.*

A former section 186.22, subdivision (b)(1) gang enhancement may be imposed only if subdivision (e) predicate offenses are proven. In the present case, as proof of one of the predicate offenses, the prosecutor presented evidence of a prior conviction suffered by Robert Carrillo, a PT gang member with the moniker Sweet Pea.

During cross-examination, appellant asked Yoro whether Yoro knew of any documentation that appellant ever knew "Robert 'Sweet Pea' Carrillo." The prosecutor objected on relevance grounds, repeatedly indicating the former section 186.22, subdivision (b)(1) gang enhancement did not require that appellant know predicate offenders. The prosecutor also posed a foundation objection concerning Yoro's "knowledge of [appellant]." The court sustained both objections.

At sidebar, appellant argued he was allegedly a PCSL member but there was no evidence he was a PT member and, since the prosecutor had offered evidence of predicate offenses, appellant was entitled to cross-examine Yoro on the issues of whether Yoro knew of documentation that appellant knew a predicate offender, and whether Yoro knew appellant knew a predicate offender.

The court indicated appellant did not have to know the predicate offenders or be a member of the criminal street gang "for the purpose of that allegation." Appellant's counsel commented, "even though [the People] are not required to show that . . . [appellant] knew him, . . . I think it's relevant to show that he didn't know them." The court again sustained the People's "objection."

During the above discussions, appellant never cross-examined, or indicated he wanted to cross-examine, Yoro concerning whether appellant knew about the prior convictions suffered by the predicate offenders, nor did the parties or court ever expressly refer to the section 190.2, subdivision (a)(22) gang special circumstance allegations.

Appellant claims the trial court improperly limited his cross-examination of Yoro. In particular, appellant argues the trial court prevented him from cross-examining Yoro "on the issue of whether appellant knew any of the [PT] members whose convictions were used to establish the pattern of gang activity, or knew about their convictions . . . ." Appellant maintains these matters were relevant to prove he lacked knowledge "that members of the [PT] gang engage in or have engaged in a pattern of criminal gang activity" for purposes of CALCRIM No. 736 and the section 190.2, subdivision (a)(22) gang special circumstance allegations, and the limitation on Yoro's testimony violated appellant's rights to confrontation.

22

However, except to the extent appellant challenges the exclusion of testimony from Yoro concerning appellant's lack of knowledge of the predicate *offenders*, appellant waived the above issues by failing to elicit testimony from Yoro or failing to raise the issue below. (Cf. *People v. Morrison* (2004) 34 Cal.4th 698, 711-712; Evid. Code, § 354.)

Moreover, even if none of the above issues were waived, there is no need to reach them. Even if we assume the court prevented Yoro from testifying on the issues of whether appellant knew PT members whose convictions were predicate convictions, or whether appellant knew about those convictions, Yoro could not testify as to what appellant knew. Appellant does not challenge the trial court's ruling sustaining the prosecutor's foundation (lack of personal knowledge) objection. The application of ordinary rules of evidence, as here, did not violate appellant's constitutional rights, including his rights to confrontation. (Cf. *People v. Boyette* (2002) 29 Cal.4th 381, 427-428.) Moreover, there was overwhelming evidence appellant knew PT's criminal purposes. (See *Carr*, *supra,* 190 Cal.App.4th at p. 487.) No prejudicial error occurred. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

7. *CALCRIM 736 Is Not Constitutionally Defective.*

The trial court, using CALCRIM No. 736 (see fn. 11, *ante*), instructed on the gang special circumstance allegations. Appellant claims the instruction is deficient because it fails to tell the jury that "to find the gang special circumstance true it must determine that appellant was an active participant of the gang whose activities were furthered by the murder, in this case, [PT]." We conclude otherwise.

Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (Cf. *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156 (*Palmer*).) CALCRIM No. 736 correctly stated the law concerning the gang special circumstance allegations and was responsive to the evidence. Appellant waived his instructional issue by failing to request appropriate clarifying or amplifying language. (Cf. *Palmer*, at p. 1156.)

23

Even if the issue was not waived, appellant's claim lacks merit. As mentioned, section 190.2, subdivision (a)(22) authorizes a defendant to be sentenced to death, or imprisonment for life without the possibility of parole, if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." CALCRIM No. 736, in relevant part, tracks this statutory language. CALCRIM No. 736 states the People are required to prove, inter alia, "2. . . . the defendant was an active participant in a criminal street gang" and "4. The murder was carried out to further the activities of the criminal street gang."

In *People v. Poggi* (1988) 45 Cal.3d 306, the defendant claimed the trial court was obligated to instruct sua sponte on the meaning of language contained in the section 190.2, subdivision (a)(17) felony-murder special circumstance. *Poggi* observed, "The law applicable here is clear. The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language. [Citation.] [¶] The portion of the instruction at issue in this case was drawn verbatim from Penal Code section 190.2, subdivision (a)(17). Defendant, however, failed to request further amplification. Finally, a jury would have no difficulty in understanding the statutory language without guidance. Accordingly, the court was not obligated to explicate the clauses in question." (*Poggi*, at p. 327.)

*Poggi's* above analysis is equally applicable here and compels rejection of appellant's claim. CALCRIM No. 736, tracking the statutory language, adequately instructs the jury that in order to prove the gang special circumstance allegations, the People had to prove the defendant was an active participant in a criminal street gang, and the murder was carried out to further the activities of that same criminal street gang. Moreover, the statutory and instructional language contains the phrase "to further the activities," a phrase referring to the defendant's mental state. Appellant would change this to refer to whether "activities were furthered," a phrase referring to whether activities were

24

objectively furthered. Appellant cites no authority holding his proposed changes are required. Appellant's claim fails. We also reject appellant's claim cumulative prejudicial error occurred.

8. *The Trial Court Properly Denied Appellant's Motion for Disclosure of Juror Identification Information.*

    a. *Pertinent Facts.*

After the verdicts but prior to the sentencing hearing, appellant, on March 24, 2010, filed a motion to release juror information. The motion was supported by a single declaration from Attorney Randy Tennen. The declaration indicated as follows. Attorney James Sussman was appellant's trial counsel. Tennen previously had been "appointed pro bono" to assist Sussman. On March 2, 2010, following the jury verdicts, Tennen stood outside the jury room to speak to jurors willing to discuss their verdict. Sussman soon joined them when Sussman finished talking to appellant.

The declaration then states, in relevant part, "4. We spoke with about five or six jurors who served on the panel, at least two of whom participated in the verdict. I spoke in particular with a juror who I believe was Juror Number 11 . . . and Attorney Sussman spoke to alternate jurors. [¶] 5. Juror Number 11 and another juror told me that while they were in the jury room 'We said "What's the defense? There wasn't any." ' [¶] 6. I heard one juror ask Attorney Sussman why [appellant] did not take the stand."

The memorandum of points and authorities argued Tennen's declaration showed the jury "may" have failed to follow the court's instructions "in that [the jury] allowed into their deliberations the fact that the defense presented no evidence and that the defendant did not testify (CALCRIM 355)." At the May 14, 2010, hearing on the motion, appellant's counsel commented, inter alia, a prima facie showing had been made that the court should release the juror information so a determination could be made as to "whether or not there was some jury misconduct."

After a discussion of pertinent law, the court indicated, inter alia, as follows. The present case was alleged to be a gang-related case. The jury found the killings were motivated by gang membership. Gang slogans were yelled at the "time of the murder."

25

The juror statements at issue provided "no evidence that the jurors held it against the defendant or even took the lack of defense into consideration in reaching their verdict." None of the jurors' statements constituted misconduct requiring the court to conduct a hearing and release jury information. There was ample evidence supporting appellant's convictions, and the true findings as to the special allegations, beyond a reasonable doubt. Appellant had failed to make a good cause showing of juror misconduct justifying a hearing, and even if a prima facie showing had been made, there was a compelling interest against disclosure, i.e., protecting jurors from danger since the crimes were gang-related murders. The court denied appellant's motion.

    b. *Analysis.*

Appellant claims the trial court erred by denying his motion for the release of juror information. He argues "appellant presented some evidence that jurors in his case had violated the court's instruction [CALCRIM No. 355[12]] and considered the fact that appellant did not testify in his own defense. The court was therefore required to set the matter for a hearing, unless there was a factual showing on the record of facts that establish a compelling interest against disclosure." We reject his claim.

Code of Civil Procedure sections 206, subdivision (g), and 237, subdivision (b) set forth procedures governing such motions, i.e., criminal defendants' petitions for access to the court's record of personal juror identification information. Code of Civil Procedure section 237, subdivision (b), requires, generally speaking, a hearing on the matter upon a prima facie showing of good cause, unless there exists a compelling interest against disclosure.

---

[12]     CALCRIM No. 355, which the court gave to the jury, states, "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

A trial court may deny an evidentiary hearing if the court concludes the defendant did not make a good cause showing of juror misconduct. (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322 (*Jefflo*).) We review a trial court's denial of such a hearing, and a trial court's denial of a petition for access to personal juror identification information, for abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317; *People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

In the present case, appellant's claim is based on the premise he was entitled to a hearing because he made "a prima facie showing of good cause" (Code Civ. Proc., § 237, subd. (b)) that jurors had violated CALCRIM No. 355 by considering the fact appellant did not testify.

However, Tennen's declaration was the sole declaration supporting appellant's motion. The declaration was patently vague. It stated, "We spoke with about five or six jurors who served on the panel, at least two of whom participated in the verdict." First, there were multiple verdicts on multiple counts dealing with offenses occurring in 2007 and 2008, not just one verdict, and it is not clear to which "verdict" the statement refers. Second, the above quoted sentence suggests that "[w]e spoke" with about five or six jurors who served on the 12-person jury, and at least two participated in the verdicts but the rest of the jurors did not participate in the verdicts. However, the verdicts were, of course, unanimous. Third, the above quoted sentence alternatively suggests "[w]e spoke" with about five or six jurors who served on the 12-person jury, and at least two participated in the discussions during the deliberations leading to the verdicts but the rest did not participate in the discussions. Other constructions are possible.

The declaration also states, "5. Juror Number 11 and another juror told me that while they were in the jury room 'We said "What's the defense? There wasn't any." ' The declaration thus recited hearsay (a fact the court was entitled to consider) at least to the extent the declaration recited what the two jurors told Tennen. The above quoted sentence does not expressly identify who "we" is, e.g., whether "we" referred merely to the two jurors, or to the two jurors and other jurors. The declaration identifies only one of the two

27

jurors, i.e., Juror No. 11. The above quoted sentence does not expressly state that the statements to the effect there was no "defense" were made during deliberations.

Moreover, as to appellant's position that the two jurors' statements to the effect there was no "defense" indicated the jury considered appellant's failure to testify, the term "defense" is ambiguous. The term could mean defense evidence (whether testimony or not) coupled with defense jury argument, as when our Supreme Court in *People v. Mayfield* (1993) 5 Cal.4th 142, stated, "[Defendant's] defense consisted of the playing of the complete audiotaped confession . . . and closing argument." (*Id.* at p. 166.) The term could simply mean defense evidence (whether testimony or not), apart from any jury argument.

According to the declaration, two jurors (appellant suggests more) made statements at some point in the jury room to the effect there was no "defense." However, if the term "defense" meant defense evidence (testimony or not) and defense jury argument, the statement was objectively false since appellant presented documentary evidence suggesting he had been misidentified as DeLeon, and appellant suggested during jury argument as to all counts that he might have been mistaken for DeLeon. Similarly, if the term "defense" simply meant defense evidence (whether testimony or not), the two jurors' statements were false since appellant presented documentary evidence.

In light of the above, it is unclear what the two jurors meant when they said there was no "defense." They may have meant, not that defense evidence and/or defense jury argument had not been presented (since obviously they had been presented) but, as hyperbole, that the defense evidence and/or argument had little convincing force. Appellant was not obligated to present defense evidence or jury argument but once he did, the jury was free to consider and evaluate said evidence and/or argument.

Alternatively, the term "defense" could have simply meant testimony from a third party defense witness(es) (i.e., a person(s) other than appellant) as when the court in *People v. Chakos* (2007) 158 Cal.App.4th 357, stated, "[appellant's] defense consisted of testimony from three witnesses [other than the defendant]." (*Id.* at p. 362.) Accordingly, when the two jurors stated there was no "defense," they may have simply meant that no

28

third party defense witness(es) had testified. In that event, the statement was true, the jury was entitled to consider the fact no third party defense witness(es) testified (since appellant had introduced documentary evidence), and the statement did not indicate the jury considered the fact appellant did not testify. The two jurors did not expressly state appellant did not testify.

Similarly, Tennen's declaration stated, "6. I heard one juror ask Attorney Sussman why [appellant] did not take the stand." Nothing in the declaration identifies the juror. Nothing in the declaration indicates (1) during deliberations, said juror asked why appellant did not take stand or (2) the fact appellant did not take the stand was considered or discussed by any juror during deliberations. In fact, Tennen indicated Sussman spoke to alternate jurors. If the juror who asked the question of Tennen was still an alternate juror, he or she did not participate in deliberations. Nothing in the declaration indicates the juror's question was based on anything other than postverdict curiosity. (Cf. *Jefflo*, *supra*, 63 Cal.App.4th at p. 1322.)

The juror asked the question of Sussman, and nothing in the declaration makes clear the timing of that question viz-a-viz the timing of the previously mentioned statements by the two jurors, where the various persons exactly were at the time of the statements and question (other than generally together outside the jury room on the courthouse lower level), or whether the question was or was not part of a colloquy in which the statements were made. The juror did not state he drew an inference adverse to appellant from the fact he did not testify.

In sum, Tennen's declaration was too vague and ambiguous to constitute a prima facie showing of good cause the jury considered appellant's failure to testify and, therefore, violated CALCRIM No. 355. Nor did the supporting memorandum assist to establish such a showing.

9. *The Trial Court Failed to Exercise Its Informed Discretion When Imposing an LWOP Sentence on Count 3.*

As discussed (see fn. 2, *ante*), our Supreme Court transferred this matter to us for reconsideration in light of *Gutierrez, supra,* 58 Cal.4th 1354. In a supplemental opening

29

brief,[13] appellant claims this court should reverse his sentence and remand the case for resentencing in accordance with *Miller, People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), and *Gutierrez.* We agree remand for resentencing is appropriate because the trial court failed to exercise its informed discretion when imposing an LWOP sentence on count 3.

 a. *Pertinent Facts.*

 A preconviction probation report prepared for a 2009 hearing reflects facts pertaining to the 2007 and 2008 present offenses and that appellant was 16 years old when he committed the 2008 offenses (counts 3 – 5). The report also reflects as follows. Appellant was involved with the "Cayuga Street Locos; Pacoima-Cayuga Street" gang. His monikers were Gangsta, Gangster, Fuco, and Temperganst. Appellant used marijuana daily in 2007. Probation records for 2007 indicated he lived with nine relatives, attended school regularly, and had satisfactory grades.

 The report indicated the following concerning appellant's prior record of juvenile offenses. In April 2007, appellant suffered separate sustained petitions for battery and felony vandalism, respectively, for each of which offenses he was placed home on probation. (Appellant committed, on about June 15, 2007, the offenses at issue in counts 1 and 2 in the present case.) In July 2007, appellant was arrested for possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)) and, in October 2007, he suffered a sustained petition for that offense and was placed home on probation. In November 2007, appellant suffered a sustained petition for robbery and was ordered placed in camp. On May 30, 2008, appellant was released from camp. (Appellant committed, on June 8, 2008, the offenses at issue in counts 3 through 5 in the present case.) At the time of the present offenses, appellant was home on probation in each of the above cases in which he suffered a sustained petition.

---

**13** After our Supreme Court transferred this matter to this court for reconsideration in light of *Gutierrez,* the parties filed supplemental briefs as authorized by California Rules of Court, rule 8.200(b)(1).

30

The report listed as aggravating factors that the crime involved great violence, great bodily harm, a threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness; his prior convictions as an adult or adjudications of commission of crimes as a juvenile were numerous or of increasing seriousness; and he had engaged in a pattern of violent conduct which indicated a serious danger to society. The report indicated there were no mitigating circumstances. The report recommended that the trial court impose consecutive sentencing.

On May 27, 2010, the People filed a sentencing memorandum that asked the trial court to impose, inter alia, an LWOP sentence on count 3 pursuant to section 190.5. The memorandum acknowledged the trial court's discretion to do otherwise under that section. Appellant did not file a sentencing memorandum.

At the May 27, 2010, sentencing hearing, the court indicated it had read, inter alia, the probation report and the People's sentencing memorandum. During argument, appellant's counsel, noting appellant was a minor at the time of the present offenses, asked that pursuant to the Eighth Amendment "the court craft a sentence which at some future date will permit [appellant], upon proper rehabilitation, an opportunity to be released."

The prosecutor commented as to count 3 that, given appellant's age, the court had discretion to impose a sentence that could result in appellant's release on parole. However, the prosecutor asked the court to impose an LWOP sentence on that count because appellant had a prior strike, he had not lived a crime-free life, "[t]here is no opportunity for [appellant] to be rehabilitated," and "there is no opportunity for his victims to have any kind of rehabilitation or . . . life . . . ."

The court indicated the probation report reflected appellant's gang monikers. The court also indicated appellant was a known member of the previously mentioned gang. The court discussed appellant's prior record as reflected in the report and discussed the facts of the present offenses (counts 1 through 5).

The court stated, "Based on [appellant's] past criminal history, the court feels the maximum sentence should be imposed." The court sentenced appellant to prison for a total prison sentence of life without the possibility of parole as to count 3, plus 105 years to

31

life.[14] On July 16, 2010, the court issued an order modifying nunc pro tunc appellant's sentence for the Molina murder (count 1) by imposing a consecutive term of 25 years to life pursuant to the Three Strikes law. Appellant's disposition otherwise remained the same, including the LWOP sentence on count 3.

    b. *Analysis*.

        (1) *Applicable Law*.

            (a) *Section 190.5, Subdivision (b).*

Section 190.5, subdivision (b) provides, in relevant part, "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 . . . has been found to be true . . . , who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

            (b) *Miller, Caballero, and Gutierrez.*

                1) *Section 190.5, Subdivision (b) Does Not Presume an LWOP Sentence.*

In *Gutierrez*, our Supreme Court stated, "For two decades, since *People v. Guinn* (1994) 28 Cal.App.4th 1130 [33 Cal.Rptr.2d 791] (*Guinn*), section 190.5(b) has been construed by our Courts of Appeal and trial courts as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of special circumstance murder." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1360.)

---

[14]     The total prison sentence consisted of life without the possibility of parole on count 3; a consecutive term of 50 years to life (25 years to life, doubled pursuant to the Three Strikes law) for the Molina murder (count 1) plus 25 years to life for the former section 12022.53, subdivision (d) enhancement pertaining to count 1; and a consecutive term of 30 years to life (15 years to life, doubled pursuant to the Three Strikes law) for the attempted murder of Maldonado (count 4). The court concluded section 654 applied to counts 2 and 5.

*Gutierrez* acknowledged "*Miller* held that 'the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders.' [Citation.]" (*Gutierrez, supra,* 58 Cal.4th at p. 1378, italics added.)**15** *Gutierrez* observed, "construing section 190.5(b) to establish a presumption in favor of life without parole raises serious constitutional concerns under the reasoning of *Miller* and the body of precedent on which *Miller* relied." (*Id.* at p. 1387.)

Accordingly, *Gutierrez* stated, "We hold that section 190.5(b) confers discretion on the sentencing court to impose either life without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of life without parole. In light of this holding, we disapprove *People v. Guinn, supra,* 28 Cal.App.4th 1130, and its progeny." (*Gutierrez, supra,* 58 Cal.4th at p. 1387.) *Gutierrez's* holding was the result of statutory interpretation of section 190.5, subdivision (b). (*Id.* at pp. 1369-1387.)

       2) *Section 190.5, Subdivision (b) Requires Trial Court Consideration of the* Miller *Factors.*

*Gutierrez* also, as a matter of statutory interpretation, concluded section 190.5, subdivision (b) authorizes "and indeed *requires* consideration of the *Miller* factors." (*Gutierrez, supra,* 58 Cal.4th at p. 1387, italics added.) *Gutierrez* acknowledged this requirement could not be found in the text of subdivision (b). (*Ibid.*) *Gutierrez* nonetheless reasoned subdivision (b) involved discretionary choices *necessarily* informed by aggravating and mitigating factors set forth in, inter alia, section 190.3. (*Ibid.*)

---

**15**  *Miller* also stated, "[G]iven all we have said . . . about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in [previous cases] of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison. [Fn. omitted.]" (*Miller, supra,* 567 U.S. at p. __ [132 S. Ct. at p. 2469].)

Section 190.3 lists factors a trier of fact must consider when determining in a special circumstance case whether a defendant shall receive the death penalty or LWOP. One such factor is "[t]he age of the defendant at the time of the crime." (§ 190.3, subd. (i).) *Gutierrez* indicated this factor permitted consideration not only of a defendant's age but any pertinent age-related matter, and, in particular, the *Miller* factors. (*Gutierrez, supra,* 58 Cal.4th at p. 1388.)

*Gutierrez* noted "*Miller* discussed a range of factors relevant to a sentencer's determination of whether a particular defendant is a ' "rare juvenile offender whose crime reflects irreparable corruption." ' [Citation.]" (*Gutierrez, supra,* 58 Cal.4th at p. 1388.) *Gutierrez* also noted *Miller*, in a " 'recap,' " (*ibid.*) grouped these factors into five categories. (*Ibid.*) *Gutierrez* stated, "We understand *Miller* to require a sentencing court to admit and consider relevant evidence of the following" (*ibid.*), then *Gutierrez* extensively discussed the five categories. (*Id.* at pp. 1388-1399.)

*Miller's* recap stated the five categories as follows: "To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth--for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 567 U.S. at p. __ [132 S. Ct. at p. 2468].)

After *Gutierrez's* more extensive discussion of the five categories, *Gutierrez* stated, "In sum, we hold that the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the

34

penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.]" (*Gutierrez, supra,* 58 Cal.4th at p. 1390.) Accordingly, *Gutierrez* earlier stated, "Because the sentencing regime created by section 190.5(b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller*, we find no constitutional infirmity with section 190.5(b) once it is understood not to impose a presumption in favor of life without parole." (*Id.* at p. 1361.) [16] That is, the section did not violate the Eighth Amendment.

### 3) Gutierrez *Concluded the Trial Court Failed to Exercise Its Informed Discretion and Remand Was Appropriate.*

Applying the above principles to the case before it, *Gutierrez* concluded the trial courts in that case[17] committed sentencing error by applying *Guinn's* holding that section 190.5, subdivision (b) created a presumption of an LWOP sentence. (*Gutierrez, supra,*

---

[16] In *Caballero*, our Supreme Court held the Eighth Amendment categorically bars a prison sentence of 110 years to life for nonhomicide offenses committed by a minor. (*Caballero, supra,* 55 Cal.4th at p. 265.) The minimum term of 110 years caused the sentence to be a "de facto" (*id.* at p. 269) LWOP. *Caballero* observed, "Although proper authorities may *later* determine that youths should remain incarcerated for their natural lives, the state may not deprive them *at sentencing* of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Id.* at p. 268, italics added.) *Caballero* later stated that under case law from the United States Supreme Court, "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board." (*Id.* at pp. 268-269.)

[17] *Gutierrez* was one of two companion cases, hence two trial courts.

35

58 Cal.4th at p. 1390.)[18] *Gutierrez* did not fault the trial courts because *Guinn* was the law at the time of sentencing. (*Ibid.*)

*Gutierrez* further concluded the trial courts in that case erroneously failed to exercise their informed discretion during sentencing, i.e., the trial courts erroneously lacked awareness of the *scope* of their discretionary powers. (*Gutierrez*, *supra,* 58 Cal.4th at p. 1391.) The error lay in the fact the trial courts were unaware of "the full scope of discretion conferred by section 190.5(b) or with the guidance set forth in *Miller* and this opinion for the proper exercise of its discretion." (*Id.* at pp. 1390-1391.) The cases *Gutierrez* cited for the proposition a trial court must exercise its informed discretion and be aware of the full scope of its discretion were rooted in due process and fundamental fairness principles. (*Id.* at p. 1391.) *Gutierrez* concluded remand for resentencing was the remedy because the record did not clearly indicate the trial court would have imposed the same sentence if the trial courts had been aware of the full scope of their discretion, and our Supreme Court could not confidently say what sentence the trial courts would have imposed absent the *Guinn* presumption. (*Ibid.*)

(2) *Application of the Law to The Present Case.*

As mentioned, appellant claims this court should reverse his sentence and remand the case for resentencing in accordance with *Miller*, *Caballero*, and *Gutierrez*. *Guinn's* holding was prevailing law at the time of appellant's May 27, 2010 sentence and the July 16, 2010 sentence modification; therefore, we presume the trial court in this case followed *Guinn*. Accordingly, *Gutierrez's* analysis, holdings, and result apply here. We conclude that on May 27, 2010, and July 16, 2010, the trial court erred (through no fault of its own) (1) by applying *Guinn's* holding that section 190.5, subdivision (b) created a presumption of an LWOP sentence, and (2) by failing to exercise its informed discretion under

---

[18]    One of the two trial courts in *Gutierrez* (see fn. 17, *ante*) had expressly referred to *Guinn's* holding. The other trial court did not, but *Gutierrez* presumed that that trial court had applied *Guinn's* holding because a trial court is presumed to have known and followed the law, and *Guinn* was the law at time of sentencing. (*Gutierrez, supra,* 55 Cal.4th at p. 1390.)

subdivision (b) with an awareness of the full scope of that discretion and the guidance of *Miller* and *Gutierrez* for the proper exercise of that discretion.

Moreover, the record does not clearly indicate the trial court in this case would have imposed the same sentence if the trial court had been aware of the full scope of its discretion, and we cannot confidently say what sentence the trial court would have imposed absent the *Guinn* presumption. Respondent concedes this matter must be remanded for resentencing in light of *Gutierrez*; we accept the concession.[19] We will vacate appellant's sentence and remand the matter to the trial court to permit it to reconsider that sentence in light of the Eighth Amendment, *Miller*, *Gutierrez,* and this opinion, and to resentence appellant accordingly.

We express no opinion as to how the trial court should weigh any permissible sentencing factors, including those discussed in *Miller, Gutierrez*, and this opinion, nor do we express an opinion as to what appellant's sentence following remand should be.

10. *Imposition of a Three Strikes Law Sentence as to Count 4 Was Proper.*

The information alleged appellant suffered a strike, i.e., a 2007 robbery conviction in case No. PJ40364. Trial on the prior conviction allegation (prior) was bifurcated. Appellant waived his right to a jury trial on the prior. On March 2, 2010, the parties stipulated appellant would admit the identity issue as to the prior, documentation concerning the prior would be submitted to the court, and the court would make findings

---

[19]     In light of the analysis and result in this case, there is no need to reach appellant's claims in his opening brief that (1) his LWOP sentence on count 3 violates the Eighth Amendment because it categorically bars an LWOP sentence for juvenile offenders or (2) the LWOP sentence constituted cruel or unusual punishment under the state Constitution. Although the focus of appellant's claim is the disposition of count 3, the trial court on remand may reconsider appellant's entire sentence. (Cf. *People v. Stevens* (1988) 205 Cal.App.3d 1452, 1455-1458; *People v. Savala* (1983) 147 Cal.App.3d 63, 66-70.) In his supplemental brief (filed after our Supreme Court remanded this matter to this court for reconsideration in light of *Gutierrez*), appellant argues we should direct that, following remand, the trial court is to set a parole eligibility date within appellant's expected lifetime if the trial court does not impose an LWOP sentence. There is no need to decide that issue as we are confident if appellant presses this issue following remand, the trial court will address it.

concerning the prior on a future date. Appellant waived his right to a court trial on the prior and admitted he was the person referred to in documents constituting court's exhibit No. 2.[20] The court indicated it would review court's exhibit No. 2, "prior to the sentencing date and make the finding on that date." The case was continued to May 27, 2010.

On May 27, 2010, the court sentenced appellant to prison (see fn. 14, *ante*). As to count 4, the court stated without objection, "Again, the term is 15 years to life. Due to the strike, that is doubled for 30 years to life." On July 16, 2010, the court issued an order modifying nunc pro tunc appellant's sentence for the Molina murder (count 1) by imposing a consecutive term of 25 years to life (instead of a consecutive term of 50 years to life pursuant to the Three Strikes law). Appellant's sentence terms otherwise remained the same. Accordingly, the sentence on count 4 was the only Three Strikes law prison sentence in this case.

Appellant claims imposition of a Three Strikes law sentence was improper. He argues (1) the record fails to show the trial court examined court's exhibit No. 2, and (2) the trial court never made "a finding as to the prior on the date set for sentencing." We reject his claim.

First, the trial court knew it was presiding over a court trial in which the only issues were whether court's exhibit No. 2 proved beyond a reasonable doubt that (1) a person suffered a sustained juvenile petition in case No. PJ40364 for a 2007 robbery, and (2) that robbery was a strike. We presume the court knew established law (*Mosley, supra,* 53 Cal.App.4th at p. 496), i.e., we presume the court knew it was required to examine court's exhibit No. 2 to determine if the above two issues had been proven. We also

---

**20**      Court's exhibit No. 2 has been transmitted to this court. The exhibit contains certified copies of court records reflecting on November 26, 2007, appellant admitted an allegation in a petition in case No. PJ40364 that he committed second degree robbery on or about October 23, 2007, and, based on that admission, the court in that case sustained the petition. There is no dispute that, based on court's exhibit No. 2, a rational trier of fact could conclude beyond a reasonable doubt that (1) a person suffered a sustained juvenile petition in case No. PJ40364 for a 2007 robbery, and (2) that robbery was a strike.

presume an official duty has been regularly performed. (Evid. Code, § 664.) We conclude the trial court performed its official duty and examined the exhibit.

Second, on March 2, 2010, appellant admitted the identity issue as to the prior. On May 27, 2010, the court sentenced appellant on count 4 as previously quoted. That Three Strikes law sentence implied determinations someone suffered a sustained juvenile petition for a 2007 robbery, a strike, in case No. PJ40364, and implied a finding appellant suffered that strike. (Cf. *People v. Clair* (1992) 2 Cal.4th 629, 691, fn. 17.)

11. *There Is No Need to Decide Whether the Parole Revocation Fine Must Be Stricken.*

As mentioned, on May 27, 2010, the court sentenced appellant as indicated in footnote 14, *ante*, and, on July 16, 2010, the court resentenced appellant by modifying nunc pro tunc his sentence for the Molina murder (count 1) only. The court thus imposed, as to the substantive offenses only, an indeterminate life sentence on count 1, life without the possibility of parole on count 3, and an indeterminate life sentence on count 4. As to count 2, the court stated, "The court imposes the midterm of two years. That is stayed pursuant to Penal Code section 654." As to count 5, the court stated, "The court imposes the midterm of three years in state prison. That is stayed pursuant to Penal Code section 654." The court imposed a $10,000 section 1202.4, subdivision (b), restitution fine and a $10,000 section 1202.45, parole revocation fine.

Appellant claims imposition of the parole revocation fine was error (because appellant's sentence included an LWOP sentence). (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075; *Carr, supra,* 190 Cal.App.4th at p. 482, fn. 6; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183-1186.) However, there is no need to decide this issue since we are vacating appellant's LWOP sentence and remanding for resentencing.

## DISPOSITION

The judgment is affirmed, except appellant's May 27, 2010, sentence, and July 16, 2010, resentence, are vacated and the matter is remanded for resentencing consistent with this opinion.[21] The trial court is directed to forward to the Department of Corrections an amended abstract of judgment.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

I concur:


ALDRICH, J.

---

[21] Due to the unavailability of the third member of the panel which heard this matter (Associate Justice H. Walter Croskey passed away on August 29, 2014), this opinion is being filed with the concurrence of the two remaining members of the panel. (Cal. Const., art. VI, § 3 ["Concurrence of 2 judges present at the argument is necessary for a judgment"]; see *People v. Castellano* (1978) 79 Cal.App.3d 844, 862.)